[Civ. No. 11649. Second Appellate District, Division One.—March 27, 1939.]

LUCIA ABOS, Respondent, v. CLYDE A. MARTYN, Appellant.

H. J. Gwartney, George G. Rinier and Thomas Morris for Appellant.

De Forrest Home and Eugene Kelly for Respondent.

WHITE, J.—This is an appeal by defendant, a licensed doctor of chiropractic, from a judgment against him for $10,000, entered upon the verdict of a jury, as well as from an order denying defendant's motion for judgment notwithstanding such verdict.

By her second amended complaint plaintiff alleged, in substance, that defendant held himself out to be a duly licensed

and competent doctor of chiropractic in the City of Los Angeles and undertook for compensation the diagnosis and treatment of an illness of plaintiff's minor child, the nature of which illness was unknown to plaintiff, and "in his capacity as a doctor of chiropractic" for a period of five months continuously treated the child; that, according to plaintiff's information and belief, at the time of the diagnosis and during the treatments the defendant did not possess or employ the knowledge, skill and learning commonly possessed and employed by chiropractors in the same locality; that defendant so carelessly and negligently diagnosed and treated said child that as a proximate result thereof the child's malady grew worse until, on or about April 23, 1933, the child died; that had defendant used or possessed that degree of skill and learning commonly possessed by practitioners of the same profession in the same locality, or had he diagnosed or treated the plaintiff's child with reasonable care and skill, the child's illness would have been cured; and that the death of said child was directly and proximately caused by defendant's lack of, and failure to exercise, that degree of knowledge and skill commonly possessed by members of the defendant's profession practicing in the same locality and by the negligence and carelessness of the defendant in diagnosing and treating the illness of plaintiff's child.

It was stipulated, in lieu of an answer, that all material allegations of the second amended complaint should be deemed denied.

■ Appellant urges that the court erred in overruling his objection to the introduction of any evidence by plaintiff on the ground that the complaint does not state facts sufficient to constitute a cause of action, in that it sets forth no facts showing any negligent act or omission nor any facts showing a causal connection between any act or omission of defendant and the death of the patient. The general rule, as stated in *Smith* v. *Buttner*, 90 Cal. 95 [27 Pac. 29], is that "negligence may be charged in general terms; that is, what was done being stated, it is sufficient to say it was negligently done, without stating the particular omission which rendered the act negligent. But it must appear from the facts averred that the negligence caused or contributed to the injury".

It sufficiently appears from this complaint that what was done by this defendant was the administration of chiropractic

treatments, which treatments, it was alleged, were negligently administered. Having alleged what was done and that the same was negligently done, the complaint was sufficient in the absence of a demurrer. While the defendant might have insisted upon greater certainty and particularity, he waived such defects by failure to interpose a special demurrer. As against a general demurrer, which is what an objection to the introduction of any evidence amounts to, the complaint is sufficient.

Plaintiff testified that she was the mother of the deceased child, Leopold Abos; that about three weeks before December 1, 1932, she noticed that he was "stooping a bit"; that the boy said it was painful for him to stand erect since a boy bumped him at school; that about December 1st he developed a weakness in the legs, and on the same date she and her husband took the boy to the office of Dr. Martyn, who took two X-rays and told them that the second X-ray showed the third vertebra to be misplaced and that it should be adjusted; that Dr. Martyn said, "Don't treat him like a sick person, because he is not sick." That Dr. Martyn gave the boy an adjustment at that time; another two days later, and again on the fifth and seventh of December; that after four or five adjustments the child developed fever, his temperature running around 100, and after that Dr. Martyn came to the boy's home to give adjustments; that he advised the parents that the boy should be kept in bed and on a liquid diet because of the fever and the adjustments should be continued; that Dr. Martyn continued to call and give an adjustment about every three days until about a week before the boy's death, which took place on April 23, 1933; that plaintiff had several conversations with Dr. Martyn with reference to the child's condition; that she asked him whether another doctor should be called in, to which he replied that "no doctor could do more than what he was doing"; that "the only thing the boy had was a certain pressure on the spinal cord, on account of the misplaced vertebra, and he was doing the best thing, and nothing more could be done for the child".

The child's mother further testified that throughout the period of treatment the child's condition "changed progressively every day. He was losing vitality and paralysis was coming from the legs to the arms, and he was completely para-

lyzed;" that he lost weight and color, and complained of pain when the adjustments were being given.

On cross-examination plaintiff testified that she knew defendant was a chiropractor; that she saw his advertisement in a newspaper; that he did not give the boy any medicine, and the only treatments he rendered were spinal adjustments; that after she dismissed the defendant she secured the services of another chiropractor.

Raymond D. Abos, brother of the deceased, testified to substantially the same effect as plaintiff, and also to a conversation between plaintiff and defendant, in which plaintiff asked defendant if he thought they were doing the proper thing for the child, to which defendant replied, "Yes, I have had these cases before, and I know that nothing I am doing can be done for the child by anyone else, and that the treatments that he is receiving are about all that he can get. *His illness is nothing but a matter of pressure upon the spine, and the only way that it can be adjusted, or, rather, that the child can be brought back to normal, is through adjustments.* And that, also, he will get worse—there is no doubt about that—and when he is cured, he will practically have to learn to walk all over again." The brother also testified to a conversation two or three weeks before the child's death in which Dr. Martyn expressed the opinion that the vertebra was practically in place and the child's illness would soon be over.

The defendant, called as a witness by plaintiff under section 2055 of the Code of Civil Procedure, testified that he took two X-rays of the spine and found *"a subluxation of the second cervical vertebra, impinging the nerves, and causing a congestion in the cord"*, as well as a *"rotation of the second, third and fourth cervical"*; that *"subluxation is a misalignment of one vertebra with the one above or the one below, or both, causing pressure upon a nerve"*; that he made an examination of the spine with his hands; that he made no laboratory tests, urinalysis, blood count, or other test, except the X-ray and the examination of the spine; that he found no abnormality, swelling, tumor, contusion or abrasion, other than the condition of the second cervical vertebra. He then testified, in part:

"Q. Did you make any diagnosis of his condition at that time?

"A. In chiropractic, we don't use the term 'diagnosis'. I take it that you want to know if I placed a name on his condition?

"Q. Yes. I want to know if you came to a conclusion?

"A. Yes, I came to a conclusion, but in chiropractic, we term it 'analysis', instead of 'diagnosis'. . . . My analysis was that he had a subluxation of the second cervical vertebra, causing an impingement of the nerves at that point. . . .

"Q. Well, was that an impingement of the nerves or of the cord?

"A. Well, it might have been from both. It was apparent from his condition that there was inflammation of the cord. The inflammation might have been from pressure on the spinal nerves, or upon the cord, itself.

" . . .

"Q. So, it was your finding and your conclusion that at all times, from the time of your first treatment to the last, there was some inflammation and congestion of the spinal cord at the region of the cervical vertebrae?

"A. Yes."

Frank R. Webb, physician and surgeon, associated with the office of the county coroner, testified that he performed an autopsy on the body of deceased, which examination "showed the body thin, the lungs congested, the left lung being pneumonic, and both lungs studded with small tubercular tubercles. The heart, liver and stomach were normal. . . . *There was no evidence of spinal or other injury.* . . . I had been informed that there was some spinal condition existing, and I therefore examined the spine to see if I could find any abnormality, which I did not find."

"Q. Assuming, Doctor, that this boy, upon whom you made this autopsy, had been treated for approximately four months and twenty days, before the date of the autopsy, by chiropractic adjustments of the second cervical vertebra; that at the time of the first adjustment, the boy was suffering from the beginnings of slight paralysis or limitation of motion of the lower extremities,—that is the two legs; that at that time his lungs were clear,—there was no evidence of tuberculosis in the lungs; that after the adjustments commenced he ran a constant, low temperature,—by that I mean a temperature of from 100 to 101 most of the time during the latter part,—I think the testimony was that it was occasionally as high as

103; that X-rays of the spine showed merely a slight subluxation of the second cervical vertebra; taken together with the findings which you made at the autopsy, are you able to state, or do you have an opinion as to what the boy was suffering from five months before,—at the beginning of the chiropractic adjustments?''

Over objection, the witness answered: ''My opinion of the condition or diagnosis of the state of health of the boy at the early stage of this treatment would be a tuberculosis of the meninges of the brain, or coverings of the brain. At that time, he showed paralysis, which is a typical symptom of early meningitis. Tuberculosis may begin in any part of the body. The fact that the lungs were clear does not dispel the idea of tuberculosis. It could have started in some of the lymph glands of the body, or it could have started in the brain coverings, themselves. Subsequently, this tuberculosis became more general, and extended into the lung tissue. At the time of the autopsy, it showed a diffuse pulmonary tuberculosis.

'' . . .

''Q. What is the medical effect of a chiropractic adjustment upon the cervical vertebrae,—particularly the second cervical vertebra, when tuberculosis of the spine exists?

'' . . .

''A. *It would be detrimental, as rest and quiet would be absolutely indicated in those cases, and that would not pertain to rest and quiet.*

''Q. Would it accelerate or increase, in your opinion, the inflammation existing?

'' . . .

''A. It would.''

This witness also testified that an examination of the X-rays which were taken by defendant, disclosed to him *no indication of dislocation, maladjustment or malposition of the vertebrae, no pathological condition, and no indication of any tubercular condition.* He further testified that in his opinion, from the history of the case, his examination of the deceased and the X-rays, had the condition been properly diagnosed and treated by rest and quiet, his chances of recovery would have been a great deal better; that by means of various tests the existence of tuberculosis in the human body can be positively determined.

Dr. Gustave F. Boehme, M. D., a diagnostician, testified that the X-rays indicated no dislocation or pathologic change, nor evidence of tuberculosis in the lungs; and in response to a hypothetical question containing the history of the case, stated that in his opinion the boy was suffering from ''some form of meningetic irritation, probably tubercular in character'', at the time he was first taken to Dr. Martyn; and that manipulation or adjustment of the spine would aggravate any condition present and accelerate the progress of the disorder; but that with rest, immobilization and proper diet the chances for recovery would be comparatively great; also that there can be an acceleration of pulmonary tuberculosis by such manipulation, and that in his opinion the adjustments in this case probably did accelerate the process.

John W. Koer, a chiropractor, testified that if the bony vertebrae were diseased ''an adjustment probably was not the thing to do, so far as the meninges were concerned,—tubercular meningitis, yes,—an adjustment could be given and relief expected; . . . with tuberculosis of the spine,—the bony spine, it is not good practice''. He further testified that the X-ray disclosed no evidence of tuberculosis of the spine, and that, according to the standards of skill and care required by chiropractors usually in this locality, it would be perfectly safe, he thought, to adjust the spine pictured in the X-ray, but if the spine were tubercular, adjustment would be contraindicated; that the Los Angeles College of Chiropractic taught ''general diagnosis'' and the use of the blood count, urinalysis and sputum tests; but that he did not know whether the use of these tests was approved by the school of which defendant was a graduate. He further testified:

''Q. Assuming that a patient was given chiropractic adjustments of the second cervical vertebra over a period of four and one-half months, and that during that period the patient got progressively worse and progressively more paralysis, and a progressively higher fever, and was progressively weaker, in your opinion, would it be good chiropractic practice to continue the adjustments? . . . Over a period of four and one-half months, would it indicate to you, as a doctor, that some other method of treatment should be followed?

''A. Other treatment might be tried.''

Dr. Vincent Askey, M. D., testified that in his opinion, from the history given, the patient was suffering from a sec-

ondary tuberculosis of the spinal column, of the spinal cord, an infection which had come from a primary source, probably the lungs; that the fact that the X-ray showed the lungs clear did not mean there could not already be tuberculosis of the lungs, which is sometimes shown only by repeated fine X-rays; that sometimes a secondary infection is found before tuberculosis is found in the lungs; that chiropractic adjustments or any motion of that type would be contrary to the well-known treatment of tuberculosis, which is absolute bed rest, and includes, if there be spinal involvement, an absolute cast fixation; that an early case, with very little, if any, evidence, if given proper treatment at the onset, in his opinion the child would have recovered. "I would say that the child died because of lack of *proper medical attention,* sanitary care, and proper fixation."

■ Appellant's contention that the evidence is insufficient to justify the verdict cannot be sustained. There is very substantial evidence in the record from which the jury could infer that the course of treatment persisted in by the defendant was not of that degree of care, diligence and skill possessed and used by prudent, skillful and careful practitioners of medicine practicing in the same vicinity. ■ While it is true that a physician in treating a patient, in the absence of a special contract so to do, does not guarantee to effect a cure (*Perkins* v. *Trueblood,* 180 Cal. 437 [181 Pac. 642]), and that he does not guarantee against unusual consequences happening during the course of such treatment nor unusual results therefrom, nevertheless, a practitioner is required by law to use the same degree of care, diligence and skill in the treatment of his patients as is possessed and used by prudent, skillful and careful practitioners of the same school practicing in the same vicinity. (*Hesler* v. *California Hospital Co.,* 178 Cal. 764 [174 Pac. 654]; *Hopkins* v. *Heller,* 59 Cal. App. 447 [210 Pac. 975].)

■ Appellant's claim that the testimony of the physicians called by respondent should have been excluded because they were of the allopathic and not the chiropractic school, is without merit. (*Ellinwood* v. *McCoy,* 8 Cal. App. (2d) 590, 594 [47 Pac. (2d) 796].) Determinative of this point is the language of the Supreme Court in *Hutter* v. *Hommel,* 213 Cal. 677, 681 [3 Pac. (2d) 554], as follows: "We might add that we are cited to no rule obtaining in this jurisdiction and

know of none which would preclude a physician trained in one medical school from testifying in a proper case as to the treatment rendered by a physician or surgeon trained in a different school. Such a rule might be promulgated where charges of negligence in a malpractice case are directed toward some special course of treatment to be tested by the general doctrine of a particular school, but it is not applicable to a case of this character where the alleged malpractice is based upon general charges of negligence relating largely to matters of almost common observation within the experience of every physician and surgeon." The evidence of allopathic physicians being competent, the same provided testimony of sufficient substantiality, if believed by the jury, to warrant the latter in finding, as by their verdict they did, that the defendant did not exercise that degree of skill and care commonly exercised by persons practicing the medical profession in the same locality. (*Rankin* v. *Mills*, 207 Cal. 438 [278 Pac. 1044]; *Johnson* v. *Clarke*, 98 Cal. App. 358 [276 Pac. 1052].) The fact that other medical witnesses testified to the contrary merely established a conflict, with which this court cannot be concerned where there is competent evidence to support the judgment. The testimony of appellant's witnesses, who were chiropractic doctors, merely contradicted respondent's evidence, and of itself furnishes no grounds upon which to reverse the judgment.

■ Appellant's contention that the court erred in refusing to grant a motion for a nonsuit upon the ground that the opening statement to the jury made by respondent's counsel did not state a cause of action, is without merit. In his opening statement to the jury, respondent's counsel undertook merely to epitomize the facts from which he expected the jury to be warranted in finding that appellant did not use the same degree of care, diligence and skill in this case as is possessed and used by prudent and skillful and careful practitioners of his school practicing in the same vicinity. A reading by us of the opening statement made by respondent's counsel to the jury convinces us of the correctness of the court's ruling. Neither do we find any error in the rulings of the trial court upon hypothetical questions asked of expert witnesses during the trial.

■ Appellant next complains that an award of damages in the sum of $10,000 for the wrongful death of plaintiff's

six-year-old son is excessive. Reviewing the decisions of the appellate courts of this state in similar cases, we cannot hold as a matter of law that the sum of $10,000 in damages is excessive. As was said in *Clark* v. *Tulare Lake Dredging Co.,* 14 Cal. App. 414, 434 [112 Pac. 564], "the jury were authorized, as the court properly instructed them, to consider and take into account, as an element affecting the pecuniary value of the service of deceased to the plaintiff, the fact that plaintiff has, by his death, been deprived of the comfort, society and protection of her son. . . . And, obviously, this element of loss of society, comfort and protection of the son to be reckoned in determining the pecuniary value of the service of the deceased to his mother is difficult to measure in mere dollars and cents, and manifestly must, with the whole question of damages, be left to the good sense and sound discretion of the jury to be exercised in the light of all the circumstances of the case." (See, also, *Hill* v. *Peres,* 136 Cal. App. 144 [28 Pac. (2d) 944], and *Frazzini* v. *Cable,* 114 Cal. App. 444 [300 Pac. 121].) The facts and circumstances in the instant case do not warrant us in saying that the amount of damages awarded is so outrageously excessive as to suggest at first blush passion, prejudice or corruption, and therefore it cannot be set aside on appeal. (*Connor* v. *Henderson,* 108 Cal. App. 237, 242 [291 Pac. 641].)

 It would unduly prolong this opinion to here set forth the instructions, the giving and refusing of which appellant urges as being erroneous. Suffice it to say that we have read the questioned instructions, and from a reading of all the instructions given we are convinced that the jury was fairly and correctly advised as to the law applicable to the facts of the case. Nowhere do we find error that prejudiced in anywise appellant's rights to a fair and impartial trial.

For the foregoing reasons the judgment and the order denying the motion for a judgment notwithstanding the verdict are, and each of them is, affirmed.

York, P. J., and Doran, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on May 25, 1939.