[Civ. No. 13821.   Second Dist., Div. One.   Mar. 8, 1943.]

RICHARD EUGENE SANSOM, a Minor, etc., et al., Respondents, v. ROSS-LOOS MEDICAL GROUP (a Copartnership) et al., Appellants.

Parker & Stanbury, Harry D. Parker and Raymond G. Stanbury for Appellants.

A. J. O'Connor and John Henry Nutt for Respondents.

DRAPEAU, J. pro tem.—When plaintiff was 14 years old his arm was broken as the result of a collision between a bicycle on which he was riding and an automobile. He was taken by his parents to the defendants for the purpose of having the broken bone set and treated. This medical service was rendered by several different doctors at different times, but they were all members of, or employees of, a partnership group of medical men called a clinic.

The broken bone was the humerus of the left arm, the longest and largest bone of the upper extremity: the long shaft-like bone in the arm reaching from shoulder to elbow. The broken place was approximately at the junction of the lower and middle thirds of the humerus, just about where the muscle swells in the arm when one demonstrates how much muscle he has.

The fracture was a complete breaking of the bone, so that the two broken ends of the shaft of the humerus slipped past each other. The doctors call this over-lapping. And all the medical witnesses agree that the fracture was at a place extremely difficult of treatment.

When the boy was brought to the doctor he was sent to the hospital, put to bed and the fracture reduced by the first defendant doctor to treat him. This was done by pulling the two broken pieces of the humerus apart in order to overcome the overlapping, and then so adjusting the broken ends in apposition to each other that nature would cause them to grow together again. Then the arm was encased in a plaster cast. And then, by a system of wires, weights and pulleys a pull was exerted upon the arm to keep the two pieces of broken bone in apposition, that is, to keep the broken ends from again slipping past each other and thus losing contact with each other. This method of pulling on a broken bone is called traction.

After a time spent in the hospital, the boy was sent home, with his arm in a plaster cast, and still under the supervision of the doctors. The first doctor who treated him was followed by another doctor, and then by the chief of the clinic. All of these doctors were orthopedists.

As time went on there was difficulty in getting the two broken ends of the bone to grow together again. This is called union.

Eventually union ensued but in such a manner that instead of the humerus being straight, the two broken ends united at an angle, leaving the bone between the elbow and the shoulder with a crook in it. This is called angulation. Also, the plaintiff's arm was one-half inch shorter than it had been before it was broken; and also, at the point of union there was a large knob of bone.

Action for malpractice was commenced against the defen-

dant doctors; issues were joined; and the case tried with a jury, which rendered a verdict against the defendant co-partners for $8,500. Motion for judgment notwithstanding the verdict was made and denied, judgment was rendered in accordance with the verdict and appeal followed.

█ The rules to be applied to solve the questions now presented to this court are well settled. The only difficulty is the application of these rules to the facts of this case.

The degree of care and skill required of physicians in treating patients is recapitulated in *Adams* v. *Boyce*, 37 Cal.App. 2d 541 [99 P.2d 1044], at page 548:

"The law on the subject of the care and skill required of physicians in the treatment of patients is well settled, and was epitomized in the case *of Hesler* v. *California Hospital Co.*, 178 Cal. 764, 767 [174 P. 654], where it was said that the law requires of the physician only 'first, that he shall have the degree of learning and skill ordinarily possessed by physicians of good standing practicing in that locality, and, second, that he shall exercise reasonable and ordinary care and diligence in treating the patient and in applying such learning and skill to the case. The law takes cognizance of human weakness and liability to err in the application of skill and learning, and it requires only the exercise of reasonable and ordinary care and diligence to avoid error.'

"Concerning the obligations assumed by a physician when he undertakes to treat a patient, it is said in the same case at page 766:

"'A physician and surgeon, by taking charge of a case, impliedly represents that he possesses, and the law places upon him the duty of possessing that reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where he practices, and which is ordinarily regarded by those conversant with the employment as necessary to qualify him to engage in the business of practicing medicine and surgery. Upon consenting to treat a patient, it becomes his duty to use reasonable care and diligence in the exercise of his skill and the application of his learning to accomplish the purpose for which he was employed. He is under the further obligation to use his best judgment in exercising his skill and applying his knowledge." (*Pike* v. *Honsinger*, 155 N.Y. (201) 209 [63 Am.St.Rep. 655, 49 N.E. (760) 762].) "The difficulties and uncertainties in the prac-

tice of medicine and surgery are such that no practitioner can be required to guarantee results, and all the law demands is that he bring and apply to the case in hand that degree of skill, care, knowledge, and attention ordinarily possessed and exercised by practitioners of the medical profession under like circumstances.'' (*Zoterell* v. *Repp,* 187 Mich. (319), 330 [153 N.W. (692) 695].) ''It is never enough to show that he has not treated his patient in that mode, nor used those measures, which in the opinion of others, even medical men, the case required; because such evidence tends to prove errors of judgment, for which the defendant is not responsible as much as the want of reasonable care and skill, for which he may be responsible.'' (*Leighton* v. *Sargent,* 27 N.H. (460), 474 [59 Am.Dec. 388].)' '' And see *Trindle* v. *Wheeler,* (Cal.App.) [133 P.2d 425], and cases there cited.

What is or what is not proper practice on the part of the physician is uniformly a question for experts and can be established only by the testimony of such experts. (*Trindle* v. *Wheeler, supra; Adams* v. *Boyce, supra; Perkins* v. *Trueblood,* 180 Cal. 437 [181 P. 642]; *Houghton* v. *Dickson,* 29 Cal.App. 321 [155 P. 128].) Such exceptions as there are to this rule are not applicable under the facts of this case.

But it is not required that the evidence demonstrate conclusively and beyond possibility of a doubt that the defendants' negligence was the proximate cause of plaintiff's injury; it is sufficient if there is substantial evidence which reasonably supports the judgment. (*Smith* v. *Coleman,* 46 Cal.App.2d 507 [116 P.2d 133].)

Two long hypothetical questions were put to plaintiff's medical expert, embracing several theories of malpractice. The last question was limited to treatment by the chief of the clinic. Certain of these theories may be described as:— failure to have X-ray pictures of the plaintiff's arm taken frequently enough to keep the attending physicians advised of the progress of the healing of the broken bone; failure to properly read or evaluate the X-ray pictures themselves, and then to take the necessary steps to correct the apparent prog-

ress of angulation of the union; too much traction, thereby keeping the broken ends of the bone apart so they did not unite properly and straight; failure to maintain traction and cast on the arm for a sufficient length of time; failure to take proper measures to correct the angulation before the broken bone formed in a solid union impossible of being straightened except by operative means. The conclusion of the first question is as follows:

"Assuming all of the foregoing facts to be true, have you an opinion as to whether or not the physician and surgeon and orthopedic specialist, doing the things which I have outlined, performed his services in a manner consistent with that degree of care and skill usually possessed and rendered by other physicians and surgeons practicing their profession in this or similar localities under substantially similar circumstances—answer yes or no, have you an opinion? A. Yes. Q. What is that opinion? MR. STANBURY: Objected to on the ground that no foundation has been laid, your Honor, incompetent. THE COURT: Objection overruled. He may answer. A. My opinion is that there was a degree of carelessness through the entire procedure, as you have read it to me. THE COURT: What was the last word? A. As he has read the question to me. Q. BY MR. O'CONNOR: In other words, I take it, Doctor, you feel that the physician and surgeon assumed in the hypothetical question did not exercise that degree of care and skill to be exercised and possessed by the average physician and surgeon practicing in this or a similar locality, is that right? MR. STANBURY: The same objection, no foundation laid; and incompetent. THE COURT: Objection overruled. A. Yes sir."

The conclusion of the second question was:

"Doctor, assuming those additional facts to be true and none other, have you an opinion as to whether the superior physician and orthopedic specialist, by doing the things which I have outlined and performing the services which I have stated, did he perform his services in a manner consistent with that degree of care and skill to be possessed and rendered and exercised by other physicians and surgeons practicing their profession in this or similar localities under substantially similar circumstances? Have you an opinion? A. Yes. Q. What is that opinion? MR. STANBURY: Objected

to, on the ground it is incompetent and no foundation laid. THE COURT: Objection overruled, he may answer. A. May I have the question? (Question read.) Q. BY MR. O'CONNOR: What is your opinion? A. I think there was a degree of carelessness also apparent here."

This testimony is sufficient to support the verdict of the jury. (*Thomason* v. *Hethcock*, 7 Cal.App.2d 634 [46 P.2d 832].)

Where there is substantial evidence from which the jury could infer that the course of treatment persisted in by the defendant was not of that care, diligence, and skill possessed and used by prudent, skillful and careful practitioners of medicine practicing in the same vicinity a reviewing court will not set the verdict aside. (*Abos* v. *Martyn*, 31 Cal.App. 2d 705 [88 P.2d 797].)

█ Appellant complains of a ruling by the trial court on objection to a question subsequently answered by the plaintiff's expert witness as follows:

"Now Doctor, the angulation you saw in the X-rays and the photographs and the examination you made of this boy, I believe you said around eight weeks ago, was that caused by the carelessness of the attending physician and surgeon? MR. STANBURY: Objected to, calling for a conclusion; attempting to reason from results, and an invasion of the province of the jury, and incompetent. THE COURT: Objection overruled. A. Yes, I do. MR. O'CONNOR: That is all."

Obviously the objection to the question should have been sustained, but just as obviously the answer is meaningless and could have had no effect upon the verdict of the jury. Also, no motion to strike was made.

█ Appellant complains of the giving of the following instruction:

"You are instructed that defendants have admitted that Dr. R. E. Hughes and Dr. Donald E. Ross held themselves out to be specialists and experts in the treatment of injuries such as that sustained by plaintiff. A specialist is one who possesses the knowledge and skill of those who have made a special study of the treatment of the particular injury. While an ordinary practicing physician, as distinguished from a specialist, is only required to have and use that degree of care and skill possessed and used by other ordinary practicing

physicians in his locality, a specialist must meet a higher requirement to the extent that he must have and use the same degree of knowledge and skill ordinarily possessed and used by other specialists, and experts of the same type in the particular locality.''

Appellant contends that by this instruction the jury was told that there was required in this case a higher standard of care than generally in actions of this kind. However, all of the defendants were orthopedists and held themselves out as such. An orthopedist is a surgeon engaged in that branch of medicine which deals with the correction of deformities and chronic diseases of the joints and spine. (The American Illustrated Medical Dictionary, by Dorland, Fifteenth Edition.)

''One who holds himself out as a specialist in the treatment of a certain organ, injury or disease, is bound to bring to the aid of one so employing him, that degree of skill and knowledge which is ordinarily possessed by those who devote special study and attention to that particular organ, injury or disease, its diagnosis and its treatment, in the same general locality, having regard to the state of scientific knowledge at the time.'' (*Hopkins* v. *Heller,* 59 Cal.App. 447, at 452 [210 P. 975].)

The instruction complained of correctly sets forth the duty of defendants in this case. In any event, the general rules were correctly stated in the instructions as a whole, and the jury could not have been misled by the giving of the instruction complained of. (*McNamara* v. *Emmons,* 36 Cal.App. 2d 199 [97 P.2d 503].)

The judgment and order, and each of them, is affirmed.

York, P. J., and White, J., concurred.