[Civ. No. 17189.   Second Dist., Div. Three.   May 16, 1950.]

FRANCES AGNEW, Appellant, v. CITY OF LOS ANGELES (a Corporation) et al., Defendants; EDWIN LARSON, Respondent.

Paul Overton and Neil G. Locke for Appellant.

Harold B. Pool for Respondent.

VALLÉE, J.—Appeal by plaintiff from a judgment for defendant Larson entered on a verdict of a jury in a malpractice action. This case had been previously tried and resulted in a judgment of nonsuit. On appeal the judgment was reversed (*Agnew* v. *City of Los Angeles,* 82 Cal.App.2d 616 [186 P.2d 450]) and the matter retried, resulting in the judgment here appealed from.

Defendant Larson is a physician and surgeon, specializing in surgery, licensed to practice in the State of California. Plaintiff had been a patient of his on a number of occasions from 1920 or 1921, the last in 1942. He had also treated other members of plaintiff's family.

In the early evening of March 3, 1943, plaintiff, then 51 years of age, slipped and fell on some wet leaves while walking on Hollywood Boulevard. She was assisted to her feet and taken to the lobby of a nearby hotel where she telephoned defendant. She was informed by his secretary that defendant was out of the city and was advised to go to the Hollywood Receiving Hospital. She did so, was examined by a physician, and later sent home in a taxicab. During the night she suffered considerable pain and the next morning telephoned defendant again and conversed with him.

There is a sharp conflict in the evidence regarding this and three subsequent conversations between the parties. Plaintiff testified with respect to the first conversation that: she told defendant about her fall, that she was in great pain, was waiting for him to come over to see her, and that she had gone

down so heavily she felt sure her hip was broken; he replied he had received a report from the receiving hospital that she was just bruised, it was not necessary for him to visit her, and that he was too busy; he advised her to put a pillow under her knee and keep any strain off her hip; he also prescribed anacin, rest and hot baths, and told her to call him the following morning.

Defendant testified that plaintiff told him about the fall and about going to the receiving hospital. He asked her whether any X-rays had been taken or suggested while she was in the receiving hospital, and she said "they had assured her she had only contusions and bruises"; she asked him if he would come and see her and he told her no, he could not and if she wanted him to attend her she would have to go to the hospital or at least have some X-ray pictures taken. He suggested a laboratory which had a portable X-ray machine that could be sent to her room. Plaintiff replied that in view of the fact she had been assured at the receiving hospital she had no breaks or injuries other than contusions, she did not want to go to the expense of hospitalization and X-rays. He told her if she felt she was in trouble she should go to the hospital or get a doctor in Hollywood.

Plaintiff testified that in the three subsequent conversations with defendant she told him her injured leg was turning out, the pain was increasing, and asked him if he did not think she should be in a hospital because it was difficult for her to get her meals when she was unable to get up and about; he said it was not necessary to send her to a hospital, she would get over this in a couple of weeks, reiterated again that a bruise was more painful than a break; at no time was the subject of X-rays discussed by defendant.

Plaintiff was confined to her room until March 11th. She testified that on the 11th while she was leaning against a dressing table, her right ankle turned over and she heard her right hip bone crack. She was immediately removed to the Cedars of Lebanon Hospital, and later to the California Hospital. On March 13th defendant called upon her and took charge of the case. X-rays taken on the 11th and 13th disclosed that plaintiff had suffered a complete, displaced fracture of the right femur, with rotation of the head. In the latter part of October and early November of 1943 plaintiff's knee commenced to hurt and she complained of increasing pain in her hip. Defendant told her this was not an unusual

aftermath of a bone fracture, and continued activity and exercise would remedy the situation. Thereafter plaintiff sought the advice of other doctors and it was discovered that aseptic necrosis of the head of the femur had developed, from which plaintiff has suffered a permanent, crippling disability. Aseptic necrosis of the femur is a "disturbance of the circulation in the head of the . . . femur"—a "loss of vitality," resulting in a stiffening of the hip.

The theory of plaintiff's case was that defendant was negligent in not having X-ray pictures taken between March 4th and 11th and that such negligence was a proximate cause of the further injuries sustained by her on March 11th and the admitted necrotic condition which later developed.

At the trial plaintiff produced three expert witnesses— Dr. John C. Wilson and Dr. Paul E. McMaster, both of whom had attended plaintiff, and Dr. Frank R. Webb.

Dr. Wilson, a specialist in diseases and injuries of bones and joints, testified he attended plaintiff from May to December of 1944, and that she had a healed fracture of the neck of the femur with an aseptic necrosis of the head. He explained that an aseptic necrosis of the femur is caused by injury to the blood vessels which supply the head of the femur; about 50 per cent of the patients get necrosis following a fracture; it never comes right away; you never can determine it in the beginning; it comes usually between the 8th and 12th month following an injury. On cross-examination he was asked: "Doctor, isn't it a more severe case of necrosis if it is an instance of an impacted or partial fracture? A. Yes, it is. I mean if it is—the so-called incomplete and impacted fractures are the ones that develop the aseptic necrosis. The complete fractures are less likely to than the others. . . . Cracks are the ones that most often get it." He also testified that to his knowledge there was nothing a physician or surgeon could do to prevent the development of necrosis.

Dr. McMaster, an orthopedic surgeon, testified he treated plaintiff in the latter part of 1945 and has seen her off and on since then; that the last X-rays taken of plaintiff on October 21, 1948, show "evidence of degenerative changes, apparently the result of an inadequate blood supply to the head of the right femur"; the percentage of patients who developed necrosis after fractures such as sustained by plaintiff would run 25 to 30. After examining the X-rays taken of plaintiff on March 11th and 13th, 1943, he was of the opinion that she had suffered a complete fracture with displacement of the

neck of the right femur, and that the condition of her right femur today was a direct result of that fracture. He was also of the opinion that on March 3, 1943, plaintiff suffered a "fracture of the neck of the femur on the right side," and at the time of her injury in her dressing room on March 11th she had "a displacement occurring at the site of the fracture . . . there is a demonstrable displacement. There may have been some displacement before. That I don't know," due to the fact that no X-rays were taken between March 3d and 11th. In answer to a question as to which injury—the injury of March 3d or that of March 11th—would "be more reasonably probable to produce the necrotic condition" found in plaintiff, he answered that either injury in his opinion could have led to the necrotic condition of the head of the femur. He was asked, "Would either one in your experience be more reasonably probable to lead to it? A. Well, that's difficult to say. A fracture at its occurrence, assuming that there is a fracture present in the neck of a femur, at that time interrupts the blood supply to the head. Now, the question of degree is a question of—the question of degree is apparently not the great importance that it is assumed to be." On cross-examination, he was asked, "Doctor, isn't it a fact that necrosis is more apt to or more liable to set in where you have a fracture without displacement than those cases in which you have a fracture with displacement, providing, of course, you get healing of the fracture where it was originally broken? A. Well, that has not been my experience." He also testified that it was possible for a person to walk who had sustained a complete fracture of the neck of the femur and also where there is a partial displacement.

It is unnecessary to relate the testimony of Dr. Webb since he testified as to a matter of fact which was contrary to plaintiff's expectation and contrary to what defendant conceded to be the fact, and plaintiff, therefore, did not question him further.

One of appellant's assignments of error is that the trial court committed prejudicial error in refusing to permit Dr. Vernon L. Andrews, a specialist in pathology, to testify. She argues, in effect, that up to the time of Dr. Andrews' testimony she had established a prima facie case from which the jury could have inferred that defendant was guilty of negligence during the period between March 4th and 11th; that it was then necessary for her to establish that such negligence was

a proximate cause of the injury of March 11th and of the aseptic necrosis, the pivotal question being whether defendant's alleged negligence contributed to or aggravated in any way the resultant aseptic necrosis; that the testimony of Dr. Andrews would have established this causal connection.

The following indicates the circumstances under which Dr. Andrews was not permitted to testify. After appellant had been taken by surprise by the testimony of Dr. Webb, one of her attorneys asked for a continuance to give him ''an opportunity to determine whether or not I can produce in court tomorrow morning credible evidence on the points I have in mind.'' The motion was granted. Thereafter, without producing additional expert medical testimony, plaintiff rested with the reservation that she be permitted to reopen her case during the course of trial. Later the plaintiff was permitted to reopen her case to allow Dr. Andrews to testify.

Dr. Andrews testified to his graduation from medical school and membership in various medical societies, and that: since 1906 he has practiced the medical profession in one branch or another; he has been pathological director of the laboratory at the Hollywood Presbyterian Hospital for about 22 years; the laboratory has charge of all laboratory work, such as bacteriology, chemistry and the examination of the surgical specimens coming from the surgery; he has been in pathology for about 41½ years; in his branch of the profession he deals with living and dead tissue; the word ''tissue'' refers to the bone and the soft parts of the body; with respect to his work in the hospital he has had occasion to observe cases of treatment of fracture of the head of the femur and has been ''asked in to see the patient'' by the attending physicians and has ''seen the X-ray pictures and talked with the doctor about the case''; he is a regular member of the staff of the hospital and was for one year president; there are regular monthly staff meetings—the staff being composed of licensed medical men in private practice in Hollywood and the immediate vicinity—where necrosis of the bone in general has been discussed; his work requires him to keep up with medical literature on the subjects of tissue and necrosis; he had had an opportunity to review the X-rays in evidence in this case.

Thereupon, the court stated: ''The Court allowed this matter to be reopened for the purpose of presenting competent testimony. There is nothing up to this time to indicate that this witness is qualified to testify as an expert . . . The witness has given us no suggestion that he knows anything about

X-rays, that he has treated any patients; there is nothing to indicate that he is qualified to testify as an expert, and it certainly is not consistent with the representations made by you to the effect that you expected to have a competent orthopedic surgeon specialist. . . . The Court has merely indicated what its views are. . . . You may proceed.''

Dr. Andrews then further testified that he views X-rays at the Hollywood Hospital very frequently; in connection with his particular type of practice it is necessary to have a knowledge of the anatomy of the body, the physiological aspects of the human body, the question of blood supply and what results from an interference with blood supply; that necrosis of the bone is not strictly an orthopedic problem; he does not treat patients and has not treated a patient in the last 22 years; he deals with living tissue while it is attached to the human body. ''Q. Doctor . . . have you ever been actively connected with a case of necrosis of the bone? A. Simply as —consulting with the doctor in certain cases, yes. Q. You have consulted with doctors? A. Yes. That is, the patient comes into the house [hospital] and the doctor calls me in to look the patient. over and see what pathological lesions are taking place, and I tell him what I think about the case. Q. In connection with forming such an opinion, has it been necessary for you to take into consideration X-rays? A. Yes, sir. Q. Histories? A. Yes, sir. Q. Doctors' conclusions? A. Yes, sir. Q. Do you have knowledge of the anatomy and the physiology of the femur, the human femur, Doctor? A. Well, I think so—some—yes. Q. What do you mean by 'some'? A. Well, the action, the muscles that extend and flex it, abduct, and so on, and it's circulation that comes to the femur, not only in the shaft of the bone but also in the head and neck of the femur. Q. Are you acquainted or do you have knowledge, from your own personal experience and your reading and knowledge, Doctor, of necrosis of the bone and its causes? A. I think so. Q. I will ask you to state, Doctor, whether or not a determination of a cause of necrosis of a bone requires a knowledge of the anatomy and physiology of that particular portion of the body? A. It certainly does.'' The witness was asked to assume facts previously testified to and was queried: ''Q. Do you now have an opinion, based upon those assumptions and based upon your experience and knowledge, and based upon your reading of the X-rays and the statement of facts, as to whether or not necrosis of the head of the femur

would be more likely to set in in a case of a complete and dislocated fracture than in the case of a partial or incomplete or complete and impacted fracture, without displacement?'' The question was objected to on the ground that it was ''incompetent, irrelevant and immaterial, and no foundation laid for it due to the lack of qualification.'' The objection was sustained, presumably on the latter ground in view of the court's previous statements. Plaintiff's attorney then continued: ''Q. . . . Doctor, what is the cause of necrosis of a bone? A. Lack of blood supply usually. Q. In relation to the question of necrosis of the head of a femur, what is the usual or ordinary cause of necrosis? A. Shutting off of the blood supply. Q. Where does that blood supply to the head of the femur come from, Doctor? A. In an elderly person largely through the capsular blood vessel. Q. What do you mean by the capsular blood vessels, Doctor? A. There is a fibrous capsule around the neck and head of the femur and the blood supply comes into the neck through this fibrous capsule.''

Thereupon, without objection by defendant, the trial court stopped the examination with the following: ''The Court will suggest to counsel that heretofore the Court has indicated that abstract discussions of the anatomy are not proper except as an incident to expert testimony. This witness is not qualified as an expert to testify in this case. The plaintiff was allowed to reopen the case for the purpose of presenting expert testimony and this witness is not qualified to testify as an expert in this field. Therefore, the Court will preclude any further testimony from this witness on matters of anatomy in general, inasmuch as that is not within the type of testimony that the Court permitted to be offered upon this reopening of the plaintiff's case.''

Appellant then made the following offer of proof: ''I offer to prove on behalf of the plaintiff by this witness, first, that the cause of necrosis of the head of the femur necessarily involves a knowledge of the anatomy, physiology, blood supply of the femur. He has, parenthetically, in my opinion, qualified with respect to that particular knowledge. I offer to prove that with a fracture as of the site as testified to in this case, that an incomplete or complete and not displaced or impacted fracture would not, in reasonable medical probabilities, completely destroy or sever the blood supply to the head of the femur; that there would be more reasonable probability of revascularization of the head of the femur if the displacement did not occur; that a displacement of the type as shown

in the X-rays taken March 11 and March 13, 1943, would in and of itself have the reasonable probability of destroying, completely destroying the blood supply to the head of the femur, with the result that necrosis would be a reasonable expectation or probability in this particular case."

The court then stated: "As indicated before, the Court allowed the plaintiff to reopen the case, which started two weeks ago today, on the representation of counsel for the plaintiff . . . that competent medical or surgical testimony would be produced. A pathologist is not competent in this field. It is not consistent with the purpose for which the plaintiff's case was allowed to be reopened, and the opinion of Dr. Andrews is undoubtedly valuable in his field, but from his own testimony he is not qualified as an expert to testify in this case." An objection to the offer of proof was sustained.

We are unable to find anywhere in the record that the reopening of the case was conditioned, as stated by the trial court, upon the production of a "competent orthopedic surgeon specialist." Plaintiff's attorneys had stated fully the opinions they expected to elicit from a qualified witness and these were the identical opinions they sought to elicit from Dr. Andrews.

To qualify a witness as a medical expert it must be shown that the witness (1) has the required professional knowledge, learning and skill of the subject under inquiry sufficient to qualify him to speak with authority on the subject, and (2) is familiar with the standards required of physicians under similar circumstances. (*Moore* v. *Belt,* 34 Cal. 2d 525, 532 [212 P.2d 509]; *Sinz* v. *Owens,* 33 Cal.2d 749, 753 [205 P.2d 3, 8 A.L.R.2d 757]; 32 C.J.S. 261, § 537.) Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than its admissibility. (*Cloud* v. *Market Street Ry. Co.,* 74 Cal. App.2d 92, 100 [168 P.2d 191]; 10 Cal.Jur. 963; 2 Wigmore on Evidence, 3d ed., 641; 31 C.J.S. 99-101.) The qualification of an expert is ordinarily a matter addressed to the sound discretion of the trial court, and its ruling will not be disturbed on appeal unless a clear abuse is shown. (*Sinz* v. *Owens,* 33 Cal.2d 749, 753 [205 P.2d 3, 8 A.L.R.2d 757]; *Mirich* v. *Balsinger,* 53 Cal.App.2d 103, 114 [127 P.2d 639].) The determinative test as to whether the trial court properly exercised its discretion is whether the witness has disclosed suffi-

cient knowledge of the subject to entitle his opinion to go to the jury. (*Valdez* v. *Percy*, 35 Cal.App.2d 485, 492 [96 P.2d 142]; *Hutter* v. *Hommel*, 213 Cal. 677, 681 [3 P.2d 554]; *Pierce* v. *Paterson*, 50 Cal.App.2d 486, 491 [123 P.2d 544]; *Mirich* v. *Balsinger*, 53 Cal.App.2d 103, 115, 118 [127 P.2d 639]; 32 C.J.S. 261, § 537.)

We are of the opinion that the trial court abused its discretion in not permitting Dr. Andrews to testify. ▮ That he was qualified we think is not subject to debate. His qualifications far exceed those of the average practicing physician. He is an adviser and consultant to other physicians on the very subjects with respect to which plaintiff was about to interrogate him. The fact that Dr. Andrews was a specialist in pathology does not, in and of itself, render him incompetent as a medical expert in the present case. The orthopedic question—e. g., the proper or improper setting of the fracture on March 13th—is not involved. The plaintiff makes no charge of negligence in this regard and the experts testified there was none. The basic medical question presented to Dr. Andrews related to the subject of aseptic necrosis. His professional knowledge, learning and skill on this subject clearly qualified him to speak with authority, and he was fully competent to give the jury his opinion as to the cause of aseptic necrosis generally and as to the cause in the present case. The applicable principle is stated in *Mirich* v. *Balsinger*, 53 Cal. App.2d 103 [127 P.2d 639], where an expert specializing in otolaryngology (ear, nose and throat), was held to be a competent expert witness in a malpractice action against a plastic surgeon, as follows, page 117: "Our attention is not directed to any rule, nor do we know of any, which mitigates against a physician trained in one school of medicine from testifying in a proper case concerning a treatment by a physician and surgeon trained in a different school. While such objection might be made in a malpractice case where the charges of negligence were directed against some special course of treatment to be tested by the teachings and doctrines of a particular school, it can have no applicability to a case like the instant one, where the general charges of negligence relate to matters within the knowledge and observation of every physician and surgeon, particularly so, where, as here, the witness testified that he had made a study of the causes of atresia; that he had seen many cases of it; that he had kept up on medical science and learning; that he had undertaken a course of plastic surgery under Professor Vincent Shehan, a national

authority on the subject; and that he had watched various surgeons work, including Drs. Smith, Kiskadden, Updegraff, Holder and Ginsberg. . . . (*Abos* v. *Martyn,* 31 Cal.App.2d 705, 713 [88 P.2d 797]; *Ellinwood* v. *McCoy,* 8 Cal.App.2d 590, 593 [47 P.2d 796]; *Hutter* v. *Hommel,* 213 Cal. 677, 681 [3 P.2d 554].)'' (See 2 Wigmore, Evidence, 665, § 569.)

■ The failure to make use of the X-ray as an aid to diagnosis in cases of fracture amounts to a failure to use that degree of care and diligence ordinarily used by physicians of good standing practicing in this community. The court, in the absence of expert testimony, may take judicial notice of this fact. (*Agnew* v. *City of Los Angeles,* 82 Cal.App.2d 616, 619 [186 P.2d 450].)

Up to the time Dr. Andrews was called, there was, as appellant points out, sufficient evidence, direct or by way of inference, from which the jury could have reasonably concluded that: 1. The relationship of physician and patient commenced and existed on March 4th. 2. In not having X-rays taken during the period of March 4th to 11th defendant did not exercise the degree of skill and care which an ordinarily prudent physician should have exercised, based upon the history given him by plaintiff. 3. Plaintiff suffered a complete fracture of the right femur without displacement on March 3d. 4. On March 11th plaintiff suffered a displacement of the fracture.

■ Up to the time the court halted the testimony of Dr. Andrews, there was no evidence on the part of plaintiff establishing a causal connection between the alleged malpractice and the disability of which she complains. If, as stated in the offer of proof, Dr. Andrews' testimony would have established this connection, it was an abuse of discretion requiring reversal for the court to exclude testimony showing that the negligence charged to defendant aggravated or was responsible for the aseptic necrosis sustained by plaintiff. In *Lawless* v. *Calaway,* 24 Cal.2d 81, 89 [147 P.2d 604], the court, notwithstanding it was satisfied there was no evidence showing that the defendant was negligent in the diagnosis or treatment of his patient's ailment, reversed a judgment of nonsuit because the trial court committed prejudicial error in limiting the scope of the examination of defendant doctor on the ground that it called for expert testimony and that an adverse party called as a witness under section 2055 could not be examined as an expert. The court stated, page 91: ''Plaintiff failed, although

it was incumbent upon her, to establish by expert testimony the standard of skill and care ordinarily exercised by practitioners in the community under like circumstances and that defendant's conduct in this instance was not consistent therewith. While it may be true that favorable answers to the questions propounded would not have supplied the deficiency in proof in this case, plaintiff was precluded, by virtue of the trial court's ruling, from continuing with the examination of the witness and developing further the line of inquiry which might have elicited the essential expert testimony. The record shows that plaintiff's counsel asked and then withdrew certain questions in order to comply with the court's ruling. The questions to which objections were sustained were appropriate preliminaries to a more complete examination of the witness, and prejudice ensued from the cutting off *in limine* of all inquiry on a subject with respect to which plaintiff was entitled to examine defendant.'' Plaintiff should have been permitted to establish by the testimony of Dr. Andrews, if she could, a causal connection between the alleged negligence of defendant and the necrotic condition.

In erroneously excluding the testimony of Dr. Andrews, the court effectively denied plaintiff a fair opportunity to prove her case. The ruling was an abuse of discretion compelling a reversal. In view of our conclusion, other assignments of error—not likely to occur on a retrial—need not be noticed.

Reversed.

Shinn, P. J., and Wood, J., concurred.