26 Cal.Rptr.3d 274 (2005)
Kevin M. ENSLEN, Plaintiff and Appellant,
v.
Robert KENNEDY et al., Defendants and Respondents.
No. G033186.
Court of Appeal, Fourth District, Division Three.
March 30, 2005.
Review Denied June 29, 2005.[*]
*275 Rinos & Martin, Dimitrios C. Rinos, Santa Ana, and M. Christopher Hall for Plaintiff and Appellant.
Law Offices of La Follette, Johnson, De Haas, Fesler, Silberberg & Ames and Brian Meadows, Santa Ana, for Defendant and Respondent Charles Miles, D.C.
Carroll, Kelly, Trotter, Franzen & McKenna, David P. Pruett, Lori A. Conway, John C. Kelly, Long Beach, and Michael A. Killackey for Defendant and Respondent Robert Kennedy aka Mark Kennedy.

OPINION
SILLS, P.J.

I. INTRODUCTION
The precise issue in this appeal is whether a family practice physician is ipso facto unqualified to render an expert opinion to the effect that a chiropractor should have known the condition the chiropractor was treating was not amenable to chiropractic treatment. This is not really a "standard of care" case in the strictest sense. The question is not whether the proper chiropractic treatment was rendered, but rather whether it was negligent on the part of the chiropractor not to realize and inform the patient that the patient's condition was beyond the competence of the chiropractor in the first place.
*276 It is, however, a case where the precedent is clear. Ellinwood v. McCoy (1935) 8 Cal.App.2d 590, 47 P.2d 796 and Abos v. Martyn (1939) 31 Cal.App.2d 705, 88 P.2d 797 are directly on point. Ammon v. Superior Court (1988) 205 Cal.App.3d 783, 252 Cal.Rptr. 748, Chadock v. Cohn (1979) 96 Cal.App.3d 205, 157 Cal.Rptr. 640, Hutter v. Hommel (1931) 213 Cal. 677, 3 P.2d 554, and Wallace v. La Vine (1940) 36 Cal.App.2d 450, 97 P.2d 879 are substantively on point. All of these cases stand for the rule that an M.D. can testify to the failure of a chiropractor to inform a patient that a condition is beyond the competence of chiropractic.[1] Further, even if there were no California precedent on point, a decision from the New Jersey Supreme Court, Rosenberg v. Cahill (1985) 99 N.J. 318, 492 A.2d 371, provides highly persuasive reasons why medical doctors are competent to testify as to the failure of chiropractor to recognize when a condition is beyond their competence. We therefore reverse the judgments rendered in favor of the two defendant chiropractors in this case.

II. FACTS
On October 1, 2001, Kevin Enslen went to a hospital emergency room, complaining of severe back pain. The emergency room physician, Andrew Khan, prescribed pain medication and bed rest.[2] At the time Enslen was also suffering "flu-like" symptoms, including fever, sweating, nausea, and had a visible infection of his arm and thumb, severe headaches and loss of vision in the right eye.
Still suffering the flu-like symptoms, on October 5 and 6, Enslen went to see chiropractor Charles Miles for acute mid- and low-back pain. Miles diagnosed "L4-5 subluxation," and "lumbar sprain/strain with associated muscle spasm." Both days Miles performed chiropractic adjustments on Enslen.
On October 8, 9, 10, and 12, Enslen saw another chiropractor, Robert Kennedy. (Kennedy also is known in the record as Mark Kennedy.) Kennedy diagnosed a variety of maladies, including "lumbar sprain, lumbar intervertebral disc syndrome," and "lumbar radiculitis." On each of the four visits, Kennedy also performed a chiropractic adjustment and myofascial release therapy on Enslen.
On October 16, Enslen returned to the same hospital emergency room, with complaints of nausea, vomiting, diarrhea, and a fever. Khan examined Enslen again, and ordered hydration and blood tests. Less *277 than 24 hours later those tests revealed a staph infection.
Unfortunately the diagnosis came too late. While being re-admitted to the hospital, Enslen suffered a debilitating stroke caused by a raging infection ("bacterial endocarditis").
Enslen then sued the various medical providers involved in his treatment since October 1, including the two chiropractors, Miles and Kennedy, on the theory that in failing to tell him that he had a non-chiropractic condition, vital medical treatment of the staph infection was delayed. The two chiropractors eventually sought summary judgment on the theory that Enslen could prove neither negligence nor causation in their treatment of him. Each presented a declaration from a chiropractor and a medical doctor. The chiropractor opined that both Miles and Kennedy had complied with the chiropractic standard of care in their treatment of Enslen, while the medical doctor essentially opined that it made no difference what the two chiropractors might have done, the patient still would have suffered "the same medical outcome."
The trial court granted summary judgment on the theory that Enslen's competing expert, Melvyn Krause, a family practice physician, was unqualified to offer an opinion on the negligence of the two chiropractors in failing to realize that their patient was not suffering from a condition amenable to chiropractic treatment.
Because Krause's declaration is the focus of this appeal, we will set forth its contents at length.
Krause is board certified in family practice, and has practiced in Southern California for more than 42 years. He also stated, for what it was worth, that he was "readily familiar with the standard of care for medical practitioners, including chiropractors."[3]
Krause has also carefully reviewed Enslen's medical records from the two chiropractors (and other sources), and noted the following: That when Enslen "presented"[4] to Miles and Kennedy, Enslen had a "triad of symptoms" indicating subacute bacterial endocarditis, namely severe back pain, fever, and a source of infection in the right arm. Krause also stated that when Enslen saw Miles on October 5 and 6, Enslen's pain was "noted to be in the mid back, constant and radiating to lower back, buttocks and proximal anterior thighs" and therefore was "clearly not radicular or nerve root pain." The pain was also extremely severea 10 on a scale of 1 through 10, and constant, also indicative that it was "not musculoskeletal pain." In fact, Enslen had suffered this same back pain prior to his visit to the hospital emergency room on October 1.
Krause then mentioned Miles' diagnosis of an L4-5 subluxation. Miles had taken no x-rays, and in Krause's opinion a physical exam would not show subluxation. Moreover, noted Krause, "subluxation at L4-5 is very rare absent a history of major trauma, such as a car accident, and no such history" was "present in this case." True, some "congenital subluxation can occur at L5-S1" but it is "usually just incidental and asymptomatic." And when *278 such subluxation happens it certainly doesn't rate a 10 on a 1-through-10 scale of pain.
Krause further noted that "[m]ost low back or mid back musculoskeletal problems in an otherwise healthy 34-year-old male typically resolve within 4 days after onset," and its particular location, it was clear that Enslen's pain was too severe, had gone on too long, and been too constant to be a "chiropractic disorder." Since Enslen was clearly suffering from flu-like symptoms at the time, including fever, sweating, nausea, had "obvious signs of infection on his arm and thumb," and complained of severe headaches and the loss of vision in his right eye, Miles had a clear duty to refer Enslen to a qualified physician.
As to Kennedy, by the time the patient saw him on October 8, he had had low back pain for more than a week despite taking Vicodin, Motrin, and Flexeril. Moreover, each of Kennedy's diagnoses was clearly flawed: Kennedy's diagnosis of a lumbar sprain was not reasonable given the history of low back pain for more than a week despite the medications he was taking. Kennedy's diagnosis of lumbar intervertebral disc syndrome was not reasonable because of the lack of "radicular symptoms." Kennedy's diagnosis of lumbar radiculitis was not reasonable for the same reason. And Kennedy's diagnosis of lumbar myofascitis was not reasonable because the patient was not responding to all the medications he was taking. Moreover, there was no improvement by Enslen's last visit to Kennedy. Again, given the character, severity, location and constancy of the pain, the obvious signs of infection in the right arm and thumb, and the fact that the patient was complaining of headaches and loss of vision in the right eye, Kennedy too should have figured out that Enslen's condition was beyond the ability of a chiropractor to treat.
As mentioned above, the trial court granted summary judgment despite Krause's declaration.[5] After an unsuccessful motion for reconsideration,[6] a formal judgment was granted in favor of Miles and both defendants obtained a formal order of summary judgment. We construe the formal order in favor of Kennedy to also include a formal judgment, so as to facilitate this appeal as to both defendants, otherwise perfected as to Miles. (See, *279 e.g., Francis v. Dun & Bradstreet, Inc. (1992) 3 Cal.App.4th 535, 539, 4 Cal. Rptr.2d 361.)[7]

III. DISCUSSION

A. The Standard of Review: A Twist on the Usual Abuse of Discretion Standard

To reiterate: Plaintiff's case against the chiropractors is not premised on the theory of improper chiropractic treatment qua chiropractic treatment (e.g., a poorly executed "Palmer adjustment") or even on a theory that the two chiropractors were under a duty to recognize that the plaintiff was suffering from the specific staph infection he was.[8] The theory of the plaintiff's case is merely that the two chiropractors should have recognized his condition was "medical" as distinct from "chiropractic" and let him know that fact, so that presumably he could seek medical attention for it.
The imposition of a duty on chiropractors to at least recognize whether a condition is treatable through chiropractic, or is really a medical condition, is the clear rule throughout the United States. (See Proof of Malpractice by Chiropractor, 55 Am.Jur. Proof of Facts 3d (2004) § 15, p. 47: "It is generally held that a physician has the duty to advise a patient to consult a specialist or one qualified in a method of treatment which the physician is not qualified to give, where she knows, or ought to that she does not have the requisite skill, knowledge, or facilities to treat the patient's ailment properly, or that the method employed has been ineffective. The same principle has been applied in the few cases dealing with a chiropractor's failure to refer a patient to a medical doctor. Thus, it has been held that chiropractors owe a duty to exercise reasonable care in analysis and treatment of their patients which includes duty to inform them when nonmedical treatment has become useless or harmful and medical treatment should be sought. This standard of care requires a chiropractor to (1) recognize a medical problem as contrasted with a chiropractic problem; (2) refrain from further chiropractic treatment when a reasonable chiropractor should be aware that the patient's condition is not amenable to chiropractic treatment ... and (3) if the ailment presented is outside the scope of chiropractic care, inform the patient that the ailment is not treatable through chiropractic means." (Emphasis added.) See also Chiropractic Malpractice Litigation, 78 Am.Jur. Trials (2004) § 116, p. 156: "A chiropractor is under a legal duty to employ proper skill, care, learning and experience in correctly diagnosing the chiropractic patient's condition. Where the chiropractor fails to employ such due diagnostic care and the patient is proximately injured, the failure which is generally referred to as misdiagnosismay constitute a malpractice act, for which the chiropractor can be liable in damages. Misdiagnosis may occur where the chiropractor: Diagnoses a chiropractic *280 condition when a medical condition actually exists ...." (Emphasis added.))
The only real wrinkle on the duty point is the issue of whether the duty stops with chiropractors simply telling their patients that (a) whatever it is that is ailing them is not amenable to chiropractic treatment, or (b) extends to further explicitly informing their patients that they should seek out medical care. This issue is academic for our purposes here: It is a reasonable inference that if one is suffering from the sorts of maladies that plaintiff Enslen here was suffering fromfever, vomiting, a right arm infection and extreme back pain for more than a weekone would be able to figure out on one's own, if told that one's condition was not amenable to chiropractic treatment, that one ought to seek out the services of medical doctor. Since neither Miles nor Kennedy went so far as to tell Enslen merely that his condition was not chiropractically treatable, we are spared the question of whether they had the further duty to spell out to Enslen the fact that he needed medical services. The precise issue we face is whether the trial court erred in a priori excluding the testimony of family practitioner Krause on the issue of whether the two chiropractors breached even that limited duty.
A few words on the standard of review are relevant here, particularly on the issue of whether we are really dealing with an "abuse of discretion" standard in this context. The decision on point on the standard of review for our purposes is Mann v. Cracchiolo (1985) 38 Cal.3d 18, 210 Cal.Rptr. 762, 694 P.2d 1134. There, the surviving husband and three sons of a woman who died after treatment at UCLA Medical Center sued a variety of attendant health care providers for medical malpractice, and related claims (including conspiracy to conceal the existence of a broken neck). A number of the doctors brought motions for summary judgment. Those motions were supported by a number of declarations of expert witnesses and, as in the present case, the motions were granted. After summarizing the contents of the supporting expert declarations (see id. at pp. 32-34, 210 Cal.Rptr. 762, 694 P.2d 1134), the court turned to declaration of the plaintiff's expert which, again as in the present case, had been found insufficient by the trial court to qualify the expert to testify as to relevant standard of care. (See id. at p. 31, 210 Cal.Rptr. 762, 694 P.2d 1134 ["The trial court also rejected Dr. Fox' declaration on the grounds that it lacked the requisite foundational facts to qualify him to testify about the standard of care...."].) So the question naturally arose in Mann, as it does in the case before us now: What was the appropriate standard of review by which to evaluate the trial court's decision, on a summary judgment motion, that the plaintiff's expert was not qualified? Here is what the Supreme Court said on that issue:
"Defendants rely on authorities that hold that the qualification of an expert is ordinarily a matter addressed to the sound discretion of the court and its ruling will not be disturbed unless a clear abuse is shown. (Chadock v. Cohn, supra, 96 Cal. App.3d 205, 208, 157 Cal.Rptr. 640.) However, the court will be deemed to have abused its discretion if the witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury." (Mann v. Cracchiolo, supra, 38 Cal.3d at p. 39, 210 Cal.Rptr. 762, 694 P.2d 1134, italics added.)
Readers will note that the italicized words enunciate an automatic or "per se" rule: The trial court "will be deemed to have abused its discretion" if the expert meets a certain threshold. It is, of course, an academic quibble as to whether such a rule should be best characterized as an *281 "abuse of discretion" standard when it is really a "sufficiency of the evidence" standard, or something else. No matter the label, the Supreme Court was clear in Mann that if the expert "disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury" the trial court had no choice but to allow the testimony. Any other result would be "deemed" an abuse of discretion. It is thus safe to say that the Mann court was articulating a rule different from what most lawyers and judges would consider the standard "abuse of discretion" test, where the decision need only be within the "bounds of reason" to be upheld on review.
Of course, such a rule wholly accords with what one would expect in the context of a summary judgment motion. Trial courts do not have the "discretion" to pick and choose between qualified experts in a summary judgment motion, and as the Mann language shows, the analysis of an expert's qualifications for purposes of a summary judgment motion is essentially binary. Either the expert discloses sufficient knowledge to render the relevant opinion, or does not. There is no middle ground where the trial court's decision will be upheld merely if it is "reasonable," even if the reviewing court would have come to a different decision itself. Perhaps we should call this standard "abuse of discretion per se." But whatever one calls it, it is clear from Mann that the ruling before us must focus on the issue of whether Krause "disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury," not whether the trial court's decision to exclude his testimony from ever reaching a jury in the first place was merely a "reasonable" one.

B. California Precedent Clearly Shows that the Plaintiff's Expert Here Was Qualified

1. The Precedent
Our state's jurisprudence of "cross-over" expert testimony has been one long march toward allowing experts in one profession to testify as to the malpractice of practitioners in a related profession or discipline when there is commonality or "overlap" between the two professions and the malpractice claim implicates that commonality or overlap.
The place to begin is Hutter v. Hommel (1931) 213 Cal. 677, 3 P.2d 554. There, the expert was a homeopathic physician one can still buy homeopathic remedies in health food storeswhile the defendant practitioner was a traditional "allopathic" (to use a now archaic term) medical doctor.[9] The traditional medical doctor defendant had botched an out-patient surgery involving removing a cyst just above the patient's eyebrows, and, as just noted, the plaintiff's expert was a homeopathic physician and surgeon. On appeal from a judgment in favor of the plaintiff, the traditional doctor argued that the homeopathic expert witness was not competent to testify as to malpractice committed by the traditional (allopathic) practitioner. Our Supreme Court made short shrift of the assertion, using the same language that it would later use in Mann: "The test is whether a witness discloses sufficient knowledge of the subject to entitle his opinion to go to jury." (Id. at p. 681, 3 P.2d 554, italics added.) Because the homeopathic expert had "specialized in eye *282 and ear work" for over twenty-five years and was "familiar with the general treatment under allopathic and any other school of surgical cases," and had done similar operations himself, it was clearly within the trial court's discretion to allow him to testify. (Ibid.)
Our Supreme Court might have stopped there, and confined Hutter to its facts, which, granted, are somewhat narrow. We recognize that the commonality between the learning of the expert homeopath and the defendant allopath in Hutter was quite highboth the expert and the defendant having done operations involving removing cysts around the eyes. But our high court did not stop there. It took the opportunity to indicate that it was favorably disposed to cross-over expert witnesses in language clearly intended to extend the scope of its holding beyond the facts at hand:
"We might add that we are cited to no rule obtaining in this jurisdiction and know of none which would preclude a physician trained in one medical school from testifying in a proper case as to the treatment rendered by a physician or surgeon trained in a different school. Such a rule might be promulgated where charges of negligence in a malpractice case are directed to some special sort of treatment to be tested by the general application of a particular school, but it is not applicable to a case of this character where the alleged malpractice is based upon general charges of negligence relating to matters of almost common observation within the experience of every physician and surgeon." (Id. at pp. 681-682, 3 P.2d 554, emphasis added.)
As we just noted, the "commonality" and "overlap" factors were close in Hutter allopath practitioner versus homeopath expert. But if there was any doubt about the propriety of a medical doctor rendering an expert opinion as to the malpractice of a chiropractor, it would soon be dispelled in two intermediate appellate decisions, Ellinwood v. McCoy (1935) 8 Cal. App.2d 590, 47 P.2d 796, and Abos v. Martyn (1939) 31 Cal.App.2d 705, 88 P.2d 797.
The specific facts in Ellinwood are rather distastefullet us merely say that a chiropractor working in the office of a "drugless practitioner" applied the wrong treatment for a case of gonorrhea. The subsequent malpractice case yielded, for the time, a very large judgment for the plaintiff. The "drugless practitioner" appealed, and one of his arguments was that a "physician" was not competent to testify as to the malpractice of a drugless practitioner. (See Ellinwood, supra, 8 Cal. App.2d at p. 594, 47 P.2d 796.) The appellate court rejected the point simply by quoting the language from Hutter which we have already quoted, which the Ellinwood court thought was self-evident to dispose of the "doctors-not-competent" argument.
Next came Abos v. Martyn (1939) 31 Cal.App.2d 705, 88 P.2d 797. In Abos, a mother brought her young boy to a chiropractor after the boy was bumped at school and he felt weakness in his legs. The boy got progressively worse, and developed a fever, all the while the chiropractor insisted that his malady was merely the result of a misplaced third vertebra. The boy eventually became paralyzed and died, with the chiropractor still insisting that the malady was just the result of pressure on the spine. It turned out at the subsequent malpractice trial, however, that the boy died of "tuberculosis of the meninges of the brain." (See id. at p. 711, 107 Cal.Rptr. 671.)
The trial involved a number of physicians, none of whom, judging from text of the opinion (see Abos, supra, 31 Cal. App.2d at pp. 710-713, 88 P.2d 797), were specifically familiar with chiropractic qua *283 chiropractic, and certainly less familiar than Krause's declaration demonstrates here.[10] Even so, the appellate court rejected as clearly "without merit" the chiropractor's argument on appeal that "the testimony of the physicians called by the respondent should have been excluded because they were of the allopathic and not the chiropractic school." (Id. at p. 713, 88 P.2d 797.) The court, as Ellinwood had done, simply quoted the language from Hutter.
After Ellinwood and Abos came Wallace v. La Vine (1940) 36 Cal.App.2d 450, 97 P.2d 879. Wallace involved a wrist injury, with the defendant chiropractor applying a cast too tight and in applying "diathermy" so hard that he damaged tendons in the plaintiff's arm, wrist and hand. Medical doctors served as expert witnesses to the chiropractor's malpractice, and, given that Ellinwood and Abos had freshly settled the issue, the defendant in Wallace didn't even bother to argue that the doctors couldn't serve as expert witnesses against him. In fact, the defendant conceded "that their testimony was competent against the defendant chiropractor for the purposes for which it was produced" (id. at p. 452, 97 P.2d 879), for which the opinion cited both Hutter and Ellinwood.
In between the Hutter-Ellinwood-Abos-Wallace line from the 1930's and 1940's, and the next major set of cases to deal with cross-over experts in overlapping but divergent disciplines (Chadock v. Cohn, supra, 96 Cal.App.3d 205, 157 Cal. Rptr. 640 and Ammon v. Superior Court, supra, 205 Cal.App.3d 783, 252 Cal.Rptr. 748) from the 1970's and 1980's, came several Supreme Court decisions in gardenvariety medical malpractice cases where the California Supreme Court took pains to show that there had been a great liberalization of the "rules relating to the testimonial qualifications of experts." (See cases cited in Brown v. Colm (1974) 11 Cal.3d 639, 645, 114 Cal.Rptr. 128, 522 P.2d 688 and Mann v. Cracchiolo, supra, *284 38 Cal.3d 18, 37, 210 Cal.Rptr. 762, 694 P.2d 1134.)
The Brown and Mann decisions afforded our high court the opportunity to catalog the numerous cases where cross-over experts had been allowed: autopsy surgeons had testified on urology; pathologists had testified as to aseptic necrosis; otolaryngolists had testified as to plastic surgery; pathologists had testified as to gynecology; and, as in Hutter, a homeopath had testified as to allopathic malpractice. As the court said in both Brown and Mann, "There are sound and persuasive reasons supporting this trend toward permitting admissibility more readily, rather than rigidly compelling rejection of expert testimony. It is obvious that an overly strict standard of qualification would make it difficult and in some instances virtually impossible to secure a qualified expert witness." (Mann, supra, 38 Cal.3d at p. 38, 210 Cal.Rptr. 762, 694 P.2d 1134, quoting Brown, supra, 11 Cal.3d at p. 646, 114 Cal.Rptr. 128, 522 P.2d 688.)
Those cases set the stage for Chadock. Chadock is significant for showing the breadth of the liberalization of cross-over expert testimony because there, like Hutter some 40 years before, a lower-prestige expert (a podiatrist, not an M.D.) testified against a higher-prestige practitioner (an M.D.). The medical doctor in Chadock was alleged to have negligently cared for a leg and foot injury, but the plaintiff was subsequently non-suited on the theory rather like that used by the trial court herethat a podiatrist was by definition incompetent to evaluate the work of a medical doctor.
The appellate court reversed. The podiatrist (as one would expect) had experience in the care of foot injuries (see Chadock, supra, 96 Cal.App.3d at p. 209, 157 Cal. Rptr. 640) and that was enough. (See id. at pp. 209, 214, 157 Cal.Rptr. 640.)
With Chadock, the "licensure" barrier unequivocally had been crossed. As the Ammon court would note a decade later, it was by now well-established that "the holder of one license may be qualified to opine concerning the standard of care applicable to the holder of a different license." (Ammon, supra, 205 Cal.App.3d at p. 790, 252 Cal.Rptr. 748, citing Chadock, supra, 96 Cal.App.3d at pp. 208-209, 157 Cal.Rptr. 640.)
Now to Ammon. The Ammon opinion is a little sparse on the specific facts, though it is clear that it was a chiropractic malpractice case, and the nature of that malpractice included negligent diagnosis, care and treatment (see Ammon, supra, 205 Cal.App.3d at p. 787, 252 Cal. Rptr. 748). In any event the core issue involved the sufficiency of the certificate of merit needed to file a medical malpractice case (which included a chiropractic malpractice case). In Ammon, the certificate of merit was based on the attorney's consultation with a physician, not a chiropractor, the trial court overruled the chiropractor's demurrer based on that fact, and the appellate court thought the issue ultimately important enough to entertain in a writ proceeding, in which it ultimately agreed with the trial court that the consultation with a physician in a case of chiropractic malpractice was sufficient.
While much of the opinion was statutory analysis, the rationale was rooted in the same concept of overlap on which the Ellinwood and Abos decisions had previously been based. First the court noted the "numerous areas of professional overlap" between physicians and chiropractors. The court said: "A certified chiropractor is authorized to use in a limited and circumscribed manner the concepts of anatomy, bacteriology, diagnosis, physiology, chemistry, hygiene, physiotherapy, and dietetics." (Id. at pp. 792-793, 252 Cal.Rptr. *285 748.) Given that overlapsignificantly including, for purposes of the case before us, both diagnosis and bacteriologythe Ammon court delivered the coup de grace to the chiropractor's challenge: "Hence, there is also a limited overlap between the practice authorized by a physician's and a surgeon's certificate and by a license to practice chiropractic. Not surprisingly, a holder of a physician's and surgeon's certificate, if possessing the necessary expertise in the particular subject at issue, may be permitted to testify in a casesuch as the present oneinvolving the professional conduct of a chiropractor." (Ammon, supra, 205 Cal.App.3d at p. 793, 252 Cal. Rptr. 748, citing Abos, supra, 31 Cal. App.2d at pp. 713-714, 88 P.2d 797 and Ellinwood, supra, 8 Cal.App.2d at p. 594, 47 P.2d 796.)

2. The Application
Ellinwood and Abos are thus both directly on point: In those cases it was enough that the experts who testified were physicians to merit allowing their testimony to go to the jury. In the present case, interestingly enough, it is clear from the substantive portions of Krause's declaration that he appears to be more familiar with chiropractic as a branch of the medical sciences than any of the doctors in Ellinwood or Abos, and so in that sense both cases control this case a fortiori. The little was okay in Ellinwood and Abos. The moreas reflected in Krause's declarationis even better here. One could also say the same thing about Wallace, though that case is of significance only because it demonstrates the clarity of the rule in the wake of Ellinwood and Abos.
Chadock, if anything, might apply a fortiori to the case before us if one were inclined to accept the proposition that physicians undergo more rigorous training than podiatrists, but even if one did not accept that idea, the case surely shows us that if an expert is familiar with the area of malpractice (in Chadock, foot injury treatment), that is enough, despite the gulf that might otherwise separate the respective disciplines. Podiatrists surely have expertise in foot care the way that family practitioners like Krause have expertise in diagnosis. Indeed, given the tendency in modern medicine for family practitioners to often actfor example, in your typical HMOas "gatekeepers," controlling access to specialists based on tentative diagnoses of a condition, one can say that family practitioners are practically specialists in diagnosis. They, of all practitioners, must be alert to knowing the need to refer out to a specialist.
Finally, Ammon cannot be contained on the theory that it is a mere statutory construction case. It expressly relied on the idea of overlapagain it cited both Ellinwood and Abos in that contextand essentially found that there was overlap between traditional (allopathic) medicine and chiropractic in the area of diagnosis and bacteriology, sufficient to mean that any physician (i.e., by definition one trained in diagnosis and bacteriology) could opine on the alleged malpractice of any chiropractor, who, noted the court, are also by definition trained in diagnosis and bacteriology. In the present case, the key areas of overlap are alsoand here Ammon is simply undistinguishablebacteriology and diagnosis.[11]

*286 C. Even Without California Precedent, Out-of-State Precedent Persuasively Shows that MDs Are Qualified to Testify About Chiropractic Malpractice

In Rosenberg v. Cahill, supra, 99 N.J. 318, 492 A.2d 371, the Supreme Court of New Jersey authored an extremely thoughtful opinion directly dealing with the capacity of a physician to testify to chiropractic malpractice. Indeed, Rosenberg is perhaps the most thoughtful opinion in the area because it confronts and explores the substantive nature of the relationship between chiropractic and traditional medicineat least as that relationship exists in the late 20th and early 21st centuries.
In Rosenberg, an infant was taken to a chiropractor, and the chiropractor's x-rays showed "observable soft tissue abnormalities" that turned out be tumors resulting from Hodgkin's disease. The father sued the chiropractor for failing to make an early diagnosis of the disease. (Rosenberg, supra, 492 A.2d at p. 373.) The complaint against the chiropractor was that he had "failed to notice" these abnormalities otherwise disclosed by x-rays. (Ibid.)
The plaintiffs' (father and infant son) expert was a medical doctor who, they contended, "was adequately qualified to render an opinion as an expert concerning the professional standard of care owed by a chiropractor in the reading of x-rays." (Id. at p. 374.) In a situation rather parallel to the case at bar, the trial court in Rosenberg granted summary judgment on the theory that the medical doctor's proffered testimony was not "competent," making Rosenberg very close to the one before us, if not on all fours. And, as in the case before us, the New Jersey high court recognized that the case turned on "whether expert proof in the form of an opinion of a licensed medical doctor is competent to establish the chiropractic standard of care in connection with observable physical conditions the actual treatment of which does not fall within the scope of chiropractic." (Id. at p. 375.)
As in the established law of California (see above), the court focused on the basic areas of overlap between medicine and chiropractic. (Unlike our dissenting colleague, the court was also not worried about whether the physician expert was specifically knowledgeable about chiropractic qua chiropractic.) The New Jersey state supreme court had previously held, in Klimko v. Rose (1980) 84 N.J. 496, 422 A.2d 418, that in "appropriate circumstances" a medical doctor "could be qualified as to the standard of care owed by a chiropractor in areas that were common to both professions." (Rosenberg, supra, 492 A.2d at p. 376, emphasis added.) The Rosenberg court further refined the issue as whether, in the case before it, "the subject of the professional expert opinion in this case implicated matters common to both the medical and chiropractic professions." (Id. at p. 376, emphasis added.)
Thenand this is what makes Rosenberg stand out in the jurisprudence in the areathe court confronted the actual differences and similarities between the chiropractic and medical professions. (See generally Rosenberg, supra, 492 A.2d at pp. 376-378.)
The Rosenberg court noted the "history of the chiropractic profession's struggle to gain acceptability and official recognition." (Id. at p. 376.) Chiropractors had fought hard to be "one type of medical practitioner" under the relevant New Jersey statutes. Thus the court recognized that in the required chiropractic education, many of the subjects "are similar to those covered in the examination for the license to practice medicine, although the latter anticipates *287 a greater depth of knowledge." (Id. at p. 377.)
In a table reproduced in the opinion, the percentage of time of various subjects in chiropractic school was given. The third highest time requirement for chiropractors (after "principles of chiropractic" and "pathology, bacteriology, and laboratory techniques"which is noteworthy by itself)is "diagnosis" at 7.5 percent. (Ibid.)
The bottom line of the Rosenberg court's comparison was that "in the universe of healing arts, chiropractic is a subset of medicine." (Id. at p. 376, italics added.) Thus, in the case before it, since "with respect to the particular practices involved in this case, namely, the use of x-ray examinations and diagnosis, there is a commonality of education, training and licensure between chiropractic and medical professions" the medical doctor was competent to testify, contrary to what the trial court had held. (Id. at p. 377, italics added.)
One comment from the Rosenberg court bears quotation here: "Chiropractic licensure also contemplates considerable education and knowledge on the part of the chiropractic practitioner with respect to the general field of diagnosis, presumably covering conditions that fall within the field of chiropractic as well as those more properly attributed to other licensed healing professions." (Rosenberg, supra, 492 A.2d at pp. 377-378, emphasis added.)
Let's compare Rosenberg with the situation in California. Interestingly enough, Rosenberg noted that in New Jersey at least, chiropractors must devote at least 300 class hours to diagnosis and symptomatolgy. (Id. at p. 378, fn. 3.) And that was in addition to even more time devoted to what one might think as the non-chiropractic subjects of bacteriology, pathology and laboratory techniques. If chiropractic were only about bone cracking, its practitioners presumably would never have to darken the door of the lab, or pay any attention at all to bacteria (like, as in the case before us, staph germs).
Now, here's the clincher when it comes to Rosenberg. When one compares the table in Rosenberg as to the respective components of chiropractic training in New Jersey with what the analogous California statute requireswell, guess what? California has more rigorous requirements in the areas of diagnosis, pathology and bacteriology than New Jersey! (Compare Rosenberg, supra, 492 A.2d at p. 377 with Bus. & Prof.Code, § 1000-5.)
In New Jersey, diagnosis was only 7.5 percent of total chiropractic training. In California, diagnosis (albeit along with dermatology, syphilogy and geriatrics, and radiological technology, safety and interpretation [x-ray reading]) is 18 percent of the curriculum. In New Jersey, pathology, bacteriology, and laboratory techniques, per the Rosenberg opinion, were 8 and 8.75 percent of the training. In California, pathology and bacteriology are 10 percent.
In short, Rosenberg represents a highly persuasive rule for California if California cases weren't already clear on the rule.

D. Krause's Declaration Shows He is Qualified to Offer an Opinion on the Alleged Chiropractic Malpractice in this Case

To reiterate, the test of an expert's qualification from Mann is whether the expert has "disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury." Here, taking Krause's declaration as a whole, it is ineluctable that he exudes knowledge of "the subject," including the things chiropractors should know to at least tell if the condition they are treating is amenable to chiropractic. It is a glaringly reasonable inference from the declaration that Krause knows his spinal *288 column, the effects of "subluxation" at various spots, the implications of subluxation and pain at points in the spinal column, and the sort of symptomology with which any competent chiropractor should be familiar. After all, there is a reason that California requires chiropractors to spend all that time studying diagnosis and bacteriology. The point of the lawsuit is, after all, that these chiropractic defendants should have known, for example, that subluxation at L4-5 accompanied by very intense pain not otherwise ascribable to trauma (and not responding to the specified medications) was not indicative of a condition treatable by chiropractic, and Krause's declaration self-evidently establishes his own knowledge of the subject, enabling him to say that.

IV. CONCLUSION
The judgments in favor of the defendant chiropractors are reversed. Because of the essentially interlocutory nature of the reversal of a summary judgment motion, instead of awarding appellate cost here, we shall direct that the trial judge shall have the discretion to award the costs from this appeal to the ultimate winner of the case.
I CONCUR: RYLAARSDAM, J.
IKOLA, J., Dissenting:
The majority opinion not only ignores fundamental rules governing the foundational requirements for expert testimony, but it also misapprehends the holdings of the cases upon which it relies as "precedent." The new rule it announces radically rewrites California law. Worse, it dangerously lowers the necessary foundational bar to qualify a witness as an expert. With the hope our Supreme Court does not let this decision stand, I respectfully, but vigorously, dissent.
The majority opinion's new rule will subject professional defendants to liability for not recognizing conditions their own profession does not expect them to recognize, but which those trained in another profession are expected to recognize. This result turns well established law on its head. What a chiropractor is obligated to know, and how that knowledge should be applied, must be judged by the standards of the chiropractic profession, and not viewed through the prism of a medical doctor's training, knowledge, and experience, unsupported by any evidence the medical doctor also has knowledge of the chiropractor's training, knowledge, experience, and the standard of care in that community.
Moreover, the majority opinion also undermines the integrity of the appellate review process by arriving at a result based in part on a mischaracterized evidentiary record. In sum, the majority opinion decides a case not before us. I hold to the belief a case should be decided upon the evidence presented.

The Majority Opinion's New Rule
The majority opinion holds that the possession of a medical license ipso facto qualifies a doctor to offer expert testimony on the issue of chiropractic negligence. In other words, a medical doctor need not establish his or her knowledge of the chiropractic standard of care before opining "on the alleged malpractice of any chiropractor." (Maj. opn. ante, at p. 285.) In so holding, the majority opinion conflicts sharply with both California law and the law generally applicable across the United States.

The Admissibility of Expert Opinion
I begin with the rules governing the admissibility of expert testimony. The test for qualifying as a medical expert is *289 well known. "`[I]t must be shown that the witness (1) has the required professional knowledge, learning and skill of the subject under inquiry sufficient to qualify him to speak with authority on the subject, and (2) is familiar with the standards required of physicians under similar circumstances.'" (Ammon v. Superior Court (1988) 205 Cal.App.3d 783, 790-791, 252 Cal.Rptr. 748 (Ammon).)
The subject of "the standards required of physicians" is also settled. As the Supreme Court explained in Landeros v. Flood (1976) 17 Cal.3d 399, 131 Cal.Rptr. 69, 551 P.2d 389, "[A] physician is required to possess and exercise, in both diagnosis and treatment, that reasonable degree of knowledge and skill which is ordinarily possessed and exercised by other members of his profession in similar circumstances." (Id. at p. 408, 131 Cal.Rptr. 69, 551 P.2d 389.) The Supreme Court also characterized the standard of care in terms of what "a reasonably prudent physician" would have done under the circumstances. (Id. at p. 410, 131 Cal.Rptr. 69, 551 P.2d 389 [doctor's liability for failing to diagnose battered child syndrome depended on whether the procedures for recognizing the syndrome "had been generally adopted in the medical profession" at the time of the alleged malpractice and "whether the ordinarily prudent physician was conducting his practice in accordance therewith"].)
Importantly, a medical professional is held to the standard of care in his or her own "school" or specialty. As the court stated in Osborn v. Irwin Memorial Blood Bank (1992) 5 Cal.App.4th 234, 7 Cal. Rptr.2d 101, "A medical practitioner is `held to the standard of practice generally accepted by his branch of the profession,' but is also `protected by this standard since compliance with accepted practice is generally taken as conclusive evidence of due care.'" (Id. at p. 278, 7 Cal.Rptr.2d 101, fn. 13; see also 36 Cal.Jur.3d (2004) Healing Arts and Institutions, § 332 and cases cited therein [rule that a medical professional will be judged by standard of his or her profession and specialty has been specifically applied to dentists, chiropractors, and radiologists].)
It goes without saying that the standard of care within the medical profession is different (some would say higher) than that within chiropractic. But a chiropractor is held only to the standard of care for chiropractors. Thus, the fact a reasonably prudent medical doctor would have made a particular diagnosis under certain circumstances does not mean a chiropractor is negligent for "missing" that diagnosis. What matters, for negligence purposes, is whether a reasonably prudent chiropractor would have made the diagnosis in similar circumstances. (Landeros v. Flood, supra, 17 Cal.3d at p. 410, 131 Cal.Rptr. 69, 551 P.2d 389; Osborn v. Irwin Memorial Blood Bank, supra, 5 Cal.App.4th at p. 282, 7 Cal.Rptr.2d 101 ["professional prudence is defined by actual or accepted practice within a profession, rather than theories about what `should' have been done"; thus, blood bank could not be found professionally negligent for failing to perform a test that no other blood bank in the nation was using].)
The majority opinion correctly points out that medical professionals may "cross-over" to opine as experts in fields other than those in which they are licensed or have practiced. However, the competency of such a "cross-over" expert depends on proof he or she has knowledge of the standard of care applicable to the practice area at issue in the malpractice action. As the court stated in Ammon, supra, 205 Cal.App.3d 783, 252 Cal.Rptr. 748, "`Where a duly licensed and practicing physician has gained knowledge of the standard of care applicable to a specialty *290 in which he is not directly engaged but as to which he has an opinion based on education, experience, observation or association with that specialty, his opinion is competent.'" (Id. at p. 791, 252 Cal.Rptr. 748, italics added.) In other words, the case law permitting "cross-over" expert testimony reaffirms the rule that a medical expert must have knowledge of the standard of care applicable to the specific health field or specialty in which the defendant practiced.
The majority opinion ignores this fundamental foundational requirement for qualifying as an expert in a malpractice actionknowledge of the applicable standard of careand declares a blanket rule that any medical doctor is qualified to testify as an expert in a malpractice action against any chiropractor. (Maj. opn. ante, at p. 285.) The opinion states that this rule derives from "clear precedent" two early California cases that are "directly on point"as well as more recent authority concerning the permissibility of "cross-over" expert testimony. In the discussion that follows, I will demonstrate that my colleagues have misread these cases. Contrary to their assertion, no California case supports the rule they announce today.
The majority opinion also offers an alternative basis for its holding. Relying on a case from New Jersey, the opinion argues that because both medical doctors and chiropractors are required to study "diagnosis, pathology and bacteriology," this "overlap" between the professions qualifies a medical doctor to opine on a chiropractor's negligence in failing to recognize a patient has a medical rather than chiropractic condition. As I explain in more detail post, the majority opinion's analysis on this point reaches far beyond the record in this case, and directly conflicts with California law concerning the foundational prerequisites for expert testimony.

The California "Precedent" Cited in the Majority Opinion
The majority opinion asserts that two rather musty cases from the 1930's are "clear precedent" for the "rule" that a medical doctor is always qualified to opine on the issue of chiropractic negligence. These cases are Ellinwood v. McCoy (1935) 8 Cal.App.2d 590, 47 P.2d 796 (Ellinwood) and Abos v. Martyn (1939) 31 Cal.App.2d 705, 88 P.2d 797 (Abos). Neither case even inferentially supports the sweeping rule the majority announces today.
Turning first to Ellinwood, the chiropractic negligence involved in the case was particularly egregious.[1] In fact, the glaring nature of the chiropractic negligence in that case explains why medical doctors, unschooled in the standard of care applicable *291 to chiropractors, were nevertheless allowed to opine on the defendant chiropractor's negligence. Importantly, Ellinwood involved application of an exception to the normal foundational requirements for qualifying as a medical expert (i.e., knowledge of the standard of care applicable to the defendant)an exception first recognized by the California Supreme Court in Hutter v. Hommel (1931) 213 Cal. 677, 3 P.2d 554 (Hutter).
The facts in Hutter are rather gruesome. A stage actress went to a medical doctor who specialized in eye, ear, nose and throat diseases, to have a small cyst located just above her left eyebrow removed. After explaining "he was in a hurry," the doctor proceeded to operate on the actress while in "his street clothes" rather than a surgical gown. During the operation he was called to the telephone at least two times and "returned to the work without cleansing or sterilizing his hands; ... he had no assistance for the operation other than that he called on [the patient's] husband to hold with an instrument a portion of the exposed cyst after the cutting started; ... her husband's hands were neither cleansed nor sterilized; ... during the operation the cyst was broken and the pus ... ran over the skin and upon [the patient's] eyelid and eyeball but [the doctor] made no effort to remove the fluid which penetrated the eye other than to wipe the surface of the lid with cotton...." (Hutter, supra, 213 Cal. at pp. 678-679, 3 P.2d 554.) After stitching up and bandaging the wound, the doctor sent the patient home.
Two days after the operation, the doctor decided the patient needed hospitalization. At that point, the horrors only worsened. After a few days in the hospital, "the upper lid of the eye" under the brow where the cyst had been removed "commenced to slough and decay; ... about eight days after the operation [the doctor] amputated a portion of the affected eyelid by taking a pair of scissors from his pocket and, apparently without sterilization thereof, cutting off a portion of the eyebrow; [the doctor] failed to draw or fasten the eyelids together with the result that the eyeball was exposed for a period of approximately two months and an ulcer ... formed thereon...." (Hutter, supra, 213 Cal. at p. 679, 3 P.2d 554.) After enduring multiple subsequent operations and skin grafts, the patient sued the doctor for loss of vision and for her career-ending permanent facial disfigurement. Not surprisingly, she won her medical malpractice case.
One of the issues on appeal was the competency of the patient's expert, a homeopathic doctor, to testify as to the negligence of the defendant, an allopathic doctor. The Supreme Court upheld the admissibility of the expert testimony based on the homeopathic doctor's demonstrated expertise in the procedure involved in the case, as well as his testimony that the standard of care for the procedure was the same in both the homeopathic and allopathic schools. (Hutter, supra, 213 Cal. at p. 681, 3 P.2d 554.) The court went on, however, to announce an additional ground for allowing the "cross-over" testimony in the case before it. The court stated, "We might add that we are cited to no rule obtaining in this jurisdiction and know of none which would preclude a physician trained in one medical school from testifying in a proper case as to the treatment rendered by a physician or surgeon trained in a different school. Such a rule might be promulgated where charges of negligence in a malpractice case are directed toward some special course of treatment to be tested by the general doctrine of a particular school, but it is not applicable to a case of this character where the alleged malpractice *292 is based upon general charges of negligence relating largely to matters of almost common observation within the experience of every physician and surgeon." (Id. at pp. 681-682, 3 P.2d 554, italics added.)
In other words, the Supreme Court recognized an exception to the general rule that a medical expert must apply the standard of care attributable to the defendant's particular "school" in those circumstances where the medical professional's negligence is so obvious that it is a matter of "almost common observation" for anyone with any form of medical training. I will refer to this as the "common observation" exception.
Now back to Ellinwood. The facts in Ellinwood are even more horrific then those of Hutter. In a misguided move, the plaintiff in Ellinwood sought treatment for gonorrhea from a drugless practitioner, Dr. McCoy. "On the occasion of this first visit, Dr. McCoy, inserted an ultra violet ray orificial applicator, also called a cold quartz rod, into respondent's urethra and left it there with electric current turned on for a period of seconds. [Dr. McCoy] also placed a diathermy electrode in respondent's rectum, with a metal plate near the small of the back. Electrical current was then applied, and the electrode heated to 102 degrees Fahrenheit. The treatment of the urethra with the cold quartz rod was given on four later days" by a chiropractor working under McCoy's direction, and the chiropractor also performed the diathermy treatments those additional times. (Ellinwood, supra, 8 Cal.App.2d at p. 592, 47 P.2d 796.)
Six days after these drugless "treatments" began, the plaintiff was "in a condition where it was impossible for him to urinate. [He] was taken to a hospital where for twelve hours various means were used in an effort to open up the urethra so that respondent could urinate. When there was such an accumulation of urine that two surgeons felt that respondent was in great danger, an abdominal operation was performed and the bladder drained by means of a tube. This tube was kept connected through the abdominal incision until the urethra healed sufficiently to allow normal flow of urine through it, which took about three weeks." (Ellinwood, supra, 8 Cal.App.2d at p. 592, 47 P.2d 796.)
At trial, various medical doctors testified concerning their observations of plaintiff's injuries. For example, one of the surgeons who operated on plaintiff testified that "the tissue within the urethra and a portion of the bladder had been so traumatized or injured that it died and sloughed off, and that respondent had suffered third degree burns of both the urethra and bladder." (Ellinwood, supra, 8 Cal.App.2d at p. 593, 47 P.2d 796.) The same doctor stated that "`the phenomena which presented themselves clinically in his case ... were characteristic of a case which had been traumatized through brutal instrumentation.'" (Ibid.) A urologist "expressed the opinion that respondent was too vigorously treated and burned with the diathermy or the violet ray."[2] (Ibid.)
The plaintiff prevailed in his malpractice action against Dr. McCoy. On appeal, the court brushed aside McCoy's argument that the testimony of the medical doctors *293 should have been excluded because these doctors were not drugless practitioners. Rather than supplying a lengthy analysis of the point, the court merely quoted the language from Hutter rejecting any need for opinion testimony grounded in the standard of care applicable to a particular "school" where "`the alleged malpractice is based upon general charges of negligence relating largely to matters of almost common observation within the experience of every physician and surgeon.'" (Ellinwood, supra, 8 Cal.App.2d at p. 594, 47 P.2d 796.)
Thus, contrary to what the majority opinion says, Ellinwood did not hold that a medical doctor is always competent to opine on the issue of chiropractic negligence. Instead, Ellinwood simply applied the "common observation" exception to the normal foundational requirements for expert testimony in the context of glaring negligence, recognizable by anyone with a modicum of medical training.
The factual circumstances of the present case do not come within the "common observation" exception. In this regard, the majority opinion mischaracterizes the evidence in the record. The opinion states that when Enslen "presented" to both Miles and Kennedy for treatment of his severe back pain, he "was clearly suffering from flu-like symptoms ... including fever, sweating, nausea, had `obvious signs of infection on his arm and thumb,' and complained of severe headaches and the loss of vision in his right eye...." (Maj. opn. ante, at p. 278.) In fact, the record contains no evidence Enslen was "clearly suffering" from anything other than back pain. While Enslen offered evidence that his father knew Enslen was experiencing these additional symptoms at the time he was visiting the chiropractors' offices, there is no evidence Enslen communicated these symptoms to the chiropractors or otherwise complained to them of severe headaches or loss of vision.
If Enslen had told the chiropractors of these additional maladies, or if the chiropractors had independently observed such symptoms, I would wholeheartedly agree their failure to suspect Enslen was suffering a medical condition not amenable to chiropractic treatment was the sort of blatant negligence that falls easily within the "common observation" exception. However, there is no evidence the chiropractors were aware Enslen was experiencing any symptoms other than severe back pain. Given the record, I cannot conclude the chiropractors displayed negligence of the "common observation" sort by failing to recognize a medical condition was the cause of Enslen's severe back pain.
In the majority opinion's other key case, Abos, supra, 31 Cal.App.2d 705, 88 P.2d 797, a mother sought to hold a chiropractor liable in negligence for her child's death from an undiagnosed case of "pulmonary tuberculosis." (Id. at p. 711, 88 P.2d 797.) She had initially brought the child to the chiropractor for treatment of slight weakness and pain in his legs. The chiropractor assessed the child as suffering from misalignment of the spine and over the course of the next five months treated him for that condition by performing regular spinal adjustments. (Id. at p. 708, 88 P.2d 797.) All the while, the chiropractor assured the mother nothing else could be done for the child and there was no need to consult a medical doctor. The child's condition progressively worsened to the point that he became paralyzed and ultimately died.
At trial, the plaintiff relied on the testimony of three medical doctors. The first, Frank Webb, was the physician and surgeon who performed the autopsy on the child. Webb testified about his observations, i.e., percipient findings, as to the *294 condition of the body generally, and his conclusion there was no evidence of spinal or other injury, and no misalignment of the spine. (Abos, supra, 31 Cal.App.2d at pp. 710-711, 88 P.2d 797.) Webb offered his opinion that when the boy began his treatments with the defendant he was suffering from "tuberculosis of the meninges of the brain," and that the chiropractic adjustments performed by the defendant would have been "detrimental" because they would "accelerate or increase ... the [existing] inflammation." (Id. at p. 711, 88 P.2d 797.) Webb also opined that had the boy's tubercular "condition been properly diagnosed and treated by rest and quiet, his chances of recovery would have been a great deal better...." (Id. at p. 711, 88 P.2d 797.)
Significantly, Webb's testimony was confined to a description of his observations of the boy's physical condition, his opinion of the proper diagnosis in the case, and his opinion that the lack of a proper diagnosis and treatment contributed to the tragic outcome. Webb did not testify the defendant was negligent in his treatment of the boy or in failing to discover the boy had a disease. (Id. at pp. 710-711, 88 P.2d 797.)
Plaintiff's second medical expert, Gustave Boehme, a diagnostician, testified as to his diagnosis of the boy's condition and also opined on the issue of causation ("manipulation or adjustment of the spine would aggravate any condition present and accelerate the progress of the disorder"). (Abos, supra, 31 Cal.App.2d at p. 712, 88 P.2d 797.) Finally, the third doctor, Vincent Askey, confirmed the diagnoses offered by the other doctors ("the patient was suffering from a secondary tuberculosis of the spinal column"), agreed that chiropractic adjustments would have been detrimental, and opined the child would have recovered "if given proper treatment at the onset." (Id. at pp. 712-713, 88 P.2d 797.) Again, none of the doctors opined the defendant was negligent in his treatment of the boy.
The only opinion testimony on the issue of the defendant's negligence came from John Koer, a chiropractor. Koer explicitly applied the chiropractic standard of care in his evaluation of the defendant's treatment of the boy. His testimony was both helpful and harmful to the defense.
Koer testified that "according to the standards of skill and care required by chiropractors usually in this locality," it was proper for the defendant to adjust "the spine pictured in the X-ray," because "the X-ray disclosed no evidence of tuberculosis of the spine." (Abos, supra, 31 Cal.App.2d at p. 712, 88 P.2d 797.) In other testimony, however, Koer grudgingly admitted the defendant's negligence in the circumstances of this case. He was asked to assume "that a patient was given chiropractic adjustments of the second cervical vertebra over a period of four and one-half months, and that during that period the patient got progressively worse and progressively more paralysis, and a progressively higher fever, and was progressively weaker, in your opinion, would it be good chiropractic practice to continue the adjustments? ... Over a period of four and one-half months, would it indicate to you, as a doctor, that some other method of treatment should be followed?" (Ibid.) Koer answered, "Other treatment might be tried." (Ibid.)
Following a jury verdict for the plaintiff, defendant argued on appeal that the testimony of the plaintiff's medical experts "should have been excluded because they were of the allopathic and not the chiropractic school." (Abos, supra, 31 Cal. App.2d at p. 713, 88 P.2d 797.) The court rejected the argument as "without merit," citing the language from Hutter concerning the "common observation" exception. *295 Admittedly, I am somewhat perplexed by the court's citation to Hutter. On the record in Abos, there was no need to justify the admission of the physicians' testimony against the chiropractic defendant, unaccompanied as it was by evidence they knew the chiropractic standard of care, for a simple reason: The physicians did not opine on the issue of chiropractic negligence.[3] The only opinion testimony on the issue of negligence came from a chiropractor who explicitly referenced the chiropractic standard of care. Consequently, Abos, like Ellinwood, does not support the rule announced by the majority that medical doctors are always qualified to opine on chiropractic negligence.
The majority opinion also cites more recent case law, specifically Chadock v. Cohn (1979) 96 Cal.App.3d 205, 157 Cal. Rptr. 640 and Ammon, supra, 205 Cal. App.3d 783, 252 Cal.Rptr. 748, as "substantively" supporting the rule that mere possession of a medical license, without more, qualifies a doctor to opine on the negligence of a chiropractor. My colleagues are wrong in their interpretation of both cases.
The majority opinion misreads the holding in Chadock. In that case, the plaintiff sued a medical doctor for negligent treatment of her foot and leg injury. The plaintiff was nonsuited after the court found her expert, a podiatrist, incompetent to testify against a medical doctor. The appellate court reversed the nonsuit. The majority opinion summarizes the basis of that decision with the simple remark that it "was enough" that the podiatrist "had experience in the care of foot injuries." (Maj. opn. ante, at p. 284.) That statement is misleading. It suggests that the only evidence relevant to the issue of the podiatrist's qualification as an expert was his experience and training in his own discipline. In fact, the Chadock court cited not only the podiatrist's extensive experience in treating foot injuries (by surgery and otherwise), but also his testimony concerning his "contact with M.D.'s who do foot surgery." (Chadock, supra, 96 Cal. App.3d at p. 213, 157 Cal.Rptr. 640.) The podiatrist explained he had "dealt with orthopedists who do foot surgery, both from the standpoint of dealing with some of their surgical problems as well as having them deal with some of my surgical problems, and we've also dealt with each other on the same boards and hospitals." (Id. at pp. 213-214, 157 Cal.Rptr. 640.)
The Chadock court concluded the trial court abused its discretion in ruling the podiatrist was incompetent to opine in the case. The court cited a single basis for its holding: "The witness' qualifications were such as to permit the trier of fact to conclude he was familiar with the standards required of physicians with Dr. Chon's qualifications." (Chadock, supra, 96 Cal.App.3d at p. 215, 157 Cal.Rptr. 640, fn. omitted.) In other words, the podiatrist had knowledge of the standard of care applicable to the defendant, a medical *296 doctor. Thus, Chadock simply affirms the general foundational requirement for qualifying as an expert (knowledge of the applicable standard of care).
The majority opinion likewise misconstrues the holding of Ammon, supra, 205 Cal.App.3d 783, 252 Cal.Rptr. 748. That case involved the interpretation of the statute requiring a "certificate of merit" from a plaintiff's attorney before a medical malpractice action can be filed. (Code Civ. Proc., § 411.30.) At issue was whether an attorney can consult with a medical doctor in confirming the merits of an action against a chiropractor. In the course of holding that such a consultation suffices, the court had significant things to say about expert qualification. Unfortunately, the majority ignores most of the points made by the court in Ammon.
The majority begins by pointing out the Ammon court's observation that, given the existence of a "limited overlap between the practice authorized by a physician's and a surgeon's certificate and by a license to practice chiropractic[,] a holder of a physician's and surgeon's certificate, if possessing the necessary expertise in the particular subject at issue, may be permitted to testify in a casesuch as the present oneinvolving the professional conduct of a chiropractor." (Id. at p. 793, 252 Cal. Rptr. 748.) In a questionable leap of logic, the majority then asserts Ammon holds that the "overlap between traditional (allopathic) medicine and chiropractic in the area of diagnosis and bacteriology" is "sufficient to mean that any physician (i.e., by definition one trained in diagnosis and bacteriology) could opine on the alleged malpractice of any chiropractor, who ... [is] also by definition trained in diagnosis and bacteriology." (Maj. opn. ante, at p. 285.)
In fact, Ammon rejects the notion that simply because there are "numerous areas of professional overlap" in the licensing requirements for the related disciplines of medicine, dentistry, podiatry, and chiropractic, a professional licensed in one discipline is automatically qualified as an expert in a related discipline, or even as to a specialty within his or her own discipline. The court stated: "Requiring consultation with an expert licensed by the same board as the defendant would not ensure that the plaintiff's attorney had consulted with an expert who practices in the same field as the defendant and who is necessarily qualified to express an opinion concerning the standards governing the defendant's practice. Because of the diversity of practice and subspecialties encompassed within the four disciplines ..., a holder of one of the four certificates or licenses is not necessarily qualified to express an opinion concerning the standard of care applicable to all other holders of the same certificate or license. [Citations.] [¶] Contrariwise, a holder of one license may be qualified to opine concerning the standard of care applicable to the holder of a different license." (Ammon, supra, 205 Cal.App.3d at p. 790, 252 Cal.Rptr. 748.)
According to Ammon, a "cross-over" witness can qualify as such an expert only upon a showing he or she possesses both the requisite "`professional knowledge, learning and skill of the subject under inquiry'" and familiarity "`with the standards required of physicians under similar circumstances.'" (Id. at pp. 790-791, 252 Cal.Rptr. 748.) The court then stated the rule I quoted earlier in this dissent, but which bears repeating: "`Where a duly licensed and practicing physician has gained knowledge of the standard of care applicable to a specialty in which he is not directly engaged but as to which he has an opinion based on education, experience, observation or association with that specialty, *297 his opinion is competent.'" (Id. at p. 791, 252 Cal.Rptr. 748.)
Ammon's explicit requirement that a "cross-over" expert witness must have knowledge of the standard of care applicable to the defendant's specialty, gained through "education, experience, observation or association with that specialty," directly conflicts with the majority opinion's assertion that Ammon holds a medical doctor automatically qualifies as an expert on chiropractic negligence by virtue of his or her possession of a medical license. Clearly, the majority has misread Ammon.
Of course, as the majority opinion states, a medical doctor can qualify to testify as to chiropractic negligence, but only if the doctor establishes his or her knowledge of the chiropractic standard of care. This is the rule not only in California but across the nation. (See, e.g., Boudreaux v. Panger (La.1986) 490 So.2d 1083, 1085 [plaintiff failed to prove chiropractic negligence through testimony of two orthopedic surgeons who lacked knowledge of chiropractic standard of care]; Sheppard v. Firth (1959) 215 Or. 268, 270-271 [334 P.2d 190, 191-192] [court erred in permitting orthopedic surgeon who lacked knowledge of chiropractic to testify on issue of chiropractic negligence]; Morgan v. Hill (Ky.Ct.App.1984) 663 S.W.2d 232, 234 [neurosurgeon could not testify as to chiropractic negligence but could properly testify as to causation of plaintiff's injury]; Stoczynski v. Livermore (Colo.Ct.App.1989) 782 P.2d 834, 836 [testimony of osteopathic physician properly admitted on issue of chiropractic negligence where he established expert knowledge of chiropractic standard of care]; Johnson v. Lawrence (Tenn.Ct.App.1986) 720 S.W.2d 50, 54-55 [medical doctor who lacked knowledge of chiropractic standard of care incompetent to testify as to chiropractor's negligence]; Taormina v. Goodman (1978) 63 A.D.2d 1018, 406 N.Y.S.2d 350, 351-352; Maxwell v. McCaffrey (1979) 219 Va. 909 [252 S.E.2d 342]; Brodersen v. Sioux Valley Memorial Hosp. (N.D.Iowa 1995) 902 F.Supp. 931, 951-952 [testimony of three medical doctors who lacked knowledge of chiropractic standard of care incompetent to prove chiropractic negligence]; Cardwell v. Bechtol (Tenn.1987) 724 S.W.2d 739, 754-755 [court properly excluded plaintiff's medical experts who lacked knowledge of standard of care applicable to defendant osteopath]; Janssen v. Mulder (1925) 232 Mich. 183, 190 [205 N.W. 159, 161] [proof of chiropractic negligence requires expert testimony "by one engaged in treatment by similar methods to those employed by defendant"]; Kerkman v. Hintz (1988) 142 Wis.2d 404, 422-423 [418 N.W.2d 795] [physician may testify as to chiropractic negligence only if physician qualifies as expert on chiropractic standard of care]; see also Annot., Competency of Physician or Surgeon of School of Practice Other Than That to Which Defendant Belongs to Testify in Malpractice Case, 1962 WL 13678 (1962) 85 A.L.R.2d 1022, § 2, and cases cited.)

The New Jersey Case and the Majority's Adoption of its "Overlapping" Curricula Rationale
The majority opinion ignores this substantial body of authority and relies on a single, contrary case from New Jersey. That case, Rosenberg by Rosenberg v. Cahill (1985) 99 N.J. 318 [492 A.2d 371] (Rosenberg), fails to persuade me, at least, that California should jettison its own rules regarding the qualification of experts, defy the national consensus, and adopt New Jersey's startlingly liberal approach to determining the testimonial competency of experts.
In Rosenberg, a young boy and his father sued a chiropractor for negligently *298 failing to detect the child had a medical condition that required referral to a medical doctor for diagnosis and treatment. The theory of the lawsuit was that the chiropractor's negligence caused the child to suffer an unreasonable delay in obtaining a proper diagnosis and timely treatment of his serious medical condition. (Rosenberg, supra, 492 A.2d at p. 373.)
As part of the initial chiropractic examination, the defendant took x-rays of the child's spine. The defendant failed to notice the x-rays showed tissue abnormalities (tumors), which doctors much later determined were symptoms of Hodgkin's disease (a type of lymphoma). The defendant's failure to detect those tissue abnormalities was the basis of the plaintiffs' negligence claim.
In a summary judgment proceeding, the trial court excluded the testimony of the plaintiffs' experta medical doctoras incompetent on the issue of the duty of a chiropractor under the circumstances. (Rosenberg, supra, 492 A.2d at p. 374.) The New Jersey Supreme Court reversed that decision and ruled the doctor was competent to opine on chiropractic negligence, based on a rationale that simply would not fly in California, or anywhere else in the nation.
The court reviewed the licensing requirements for chiropractors and concluded many of the subjects studied by chiropractic students "are similar to those covered" in medical school, and that the two professions' "[e]ducational requirements ... reflect parallel emphasis on common subjects." (Rosenberg, supra, 492 A.2d at p. 377.) The court particularly noted that both chiropractors and doctors were required to study and train in "the use of x-ray examinations and diagnosis." (Id. at p. 377.) The court went on to conclude, based on this "commonality of education, training, and licensure between the chiropractic and medical professions" in the use of x-rays and in diagnosis, that a medical doctor is qualified to opine on a chiropractor's duty in reading x-rays. (Ibid., italics added.)
The rationale in Rosenberg is directly at odds with California law. According to Rosenberg, a professional licensed in one field can testify as an expert in another field so long as the course of study for both licenses involves taking "similar" courses. (Rosenberg sidesteps, of course, the important issue of whether a course in "diagnosis" at a chiropractic school is really the same thing as the study of "diagnosis" in medical school.) In other words, so long as there is a "commonality" or "overlap" between the two professions in terms of education and licensing, expertise in one field translates to expertise in the other. Such a liberal approach to expert qualification is a radical departure from the standards in California.
Ammon, supra, 205 Cal.App.3d 783, 252 Cal.Rptr. 748, makes clear that regardless of the "numerous areas of professional overlap" in the licensing requirements for medicine, dentistry, podiatry, and chiropractic, a professional licensed in one of these disciplines can qualify as an expert in another only upon proof he or she is knowledgeable of that other field's standard of care. (Id. at pp. 790-791, 252 Cal.Rptr. 748.) In relying on the rationale from Rosenberg, the majority opinion fails to mention this direct conflict with Ammon.
There is yet another problem with the majority opinion's adoption of the Rosenberg rationale. It involves consideration of "facts" that are not part of the record from the summary judgment proceeding. The majority opinion cites California's statutory requirements for chiropractic education (Bus. & Prof.Code, §§ 1000-1005), and *299 draws some highly questionable conclusions from those requirements concerning a chiropractor's education in diagnosis and bacteriology (subjects the majority assumes are relevant here in light of Enslen's staph infection).
Not only was this information not presented to the trial court, but it was also not even the subject of briefing here on appeal. Nor did any party ask this court to take judicial notice of the statutory material upon which the majority relies. Moreover, even if we had received such a request, this court is in no position to evaluate the significance of the cursory information set forth in the material in question. After all, if, as the majority says, "18 percent of the curriculum" in a chiropractic college is collectively spent on diagnosis, dermatology, syphilogy, geriatrics, radiological technology, and x-ray reading, can we really conclude, as the majority does, that there is an "overlap" between chiropractic and medicine in the area of diagnosis? This is an easy one to answer: No. This is the sort of inquiry best left to trial courts.
In conclusion, the majority opinion is simply unpersuasive in arguing that Rosenberg and its "overlapping curricula" approach justify adopting a new rule in California that allows a medical doctor to opine on chiropractic negligence, without proving knowledge of the chiropractic standard of care.

The Trial Court Properly Excluded Krause's Testimony
There is no support for the rule announced by the majority. We thus return to the question of whether the trial court erred (committed an "abuse of discretion per se," to use the majority's words) in excluding the testimony of Enslen's sole expert on chiropractic negligence.
As the majority opinion points out, the pertinent inquiry is whether "the witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury." (Mann v. Cracchiolo (1985) 38 Cal.3d 18, 39, 210 Cal.Rptr. 762, 694 P.2d 1134.) "The subject" at issue is the chiropractic standard of care.
Enslen offered no evidence Dr. Krause had knowledge of the standard of care applicable to chiropractors. Krause's declaration did not state he had ever practiced chiropractic, studied the subject, or had any "association with that specialty." (Ammon, supra, 205 Cal.App.3d at p. 791, 252 Cal.Rptr. 748.) Krause's bald assertion he is "readily familiar with the standard of care for medical practitioners, including chiropractors" was a mere conclusion, devoid of evidentiary support.
Moreover, Krause's status as a medical doctor specializing in family practice was an insufficient basis from which to infer the requisite knowledge of the chiropractic standard of care. As Ammon, supra, 205 Cal.App.3d 783, 252 Cal.Rptr. 748, made clear, a witness can qualify as an expert in a specialty other than his/her own only if knowledgeable of the applicable standard of care, gained through "education, experience, observation or association with that specialty." (Id. at p. 791, 252 Cal.Rptr. 748.) Krause's declaration contained no such foundation.
More must be required of a witness to qualify as an expert. The trial court got it right.
My colleagues and I agree the test for admission of expert testimony is whether the witness discloses "`sufficient knowledge of the subject to entitle his opinion to go to the jury.'" (Maj. opn. ante, at p. 281, italics added.) The problem is the majority opinion gives lip service to the rule while declining to follow it. When one looks for the disclosure of "sufficient *300 knowledge" in the evidence here, it is painfully clear there is only Krause's medical license, his bald conclusion that he was familiar with the chiropractic standard of care, and his knowledge of what a medical doctor should have diagnosed given the patient's symptoms. Given these facts, the majority concludes a medical license by itself is a sufficient disclosure of the requisite knowledge. I am not comfortable adopting this extraordinarily relaxed and unprecedented standard for admitting "expert" testimony.
I would affirm the judgment.
NOTES
[*] In denying review, the Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976, 977 and 979).
[1] Ordinarily, such a casewholly controlled by clear precedentwould not merit publication under rule 976(b) of the California Rules of Court. Why simply add to the official reports yet another case applying a well-established rule? However, in this case there is a dissenting opinion, and we are not unmindful of the considerable body of academic scholarship critical of intermediate appellate courts that do not publish cases with dissents. (E.g., Pearson, Citation of Unpublished Opinions as Precedent (May 2004) 55 Hastings L.J. 1235, 1266, fn. 268 [noting study that significant number of cases with dissents go unpublished "despite the fact that disagreement on the panel indicates the cases are `controversial' "].) As far as the majority is concerned, there is something questionable about a decision not to publish when there is a vigorous dissentit suggests that the majority are not willing to expose their decision to the additional scrutiny that necessarily comes with publication. To put it another way, if there is a dissent, and the majority do not publish, it suggests that they (or at least one of them) lack the courage of their analysis. In that regard, while the dissent charges that we "misapprehend[] the holdings" of all these cases, we invite readers to decide for themselves.
[2] Khan is also a defendant in this action, but not a party to this appeal. This appeal concerns only the two chiropractor defendants.
[3] Our dissenting colleague does not think it was worth anything. As we show anon, though, precedent has allowed medical testimony in chiropractic malpractice cases without even that.
[4] The medical profession uses the word "present" in the same screw-ball way that the legal profession uses the word "notice." Doctors say "present" when they mean "present oneself," "showed," or "displayed himself or herself" much like lawyers say "notice" when they mean "send notice to."
[5] While the our dissenting colleague takes us to task for "mischaracteri[zing]" the evidentiary record, the fact is that (1) this was a case that comes to us from summary judgment, so the reasonable inferences (e.g., that the plaintiff was actually suffering flu-like symptoms at the time he "presented" to the chiropractors) must be drawn in favor of the plaintiff. The dissent also ignores Dr. Krause's evident familiarity with back pain and subluxation. Moreover, we reiterate that this case comes to us on a motion for summary judgment. If this case had come to us from trial, Dr. Krause's familiarity with chiropractic qua chiropractic would probably have been the subject of considerable exploration. Here, though, there is no indication that the defendants sought to take Dr. Krause's deposition to ascertain the extent of his knowledge. We have only his declaration, with its evident familiarity with diagnosis, back pain and sub-luxation to go on. In the context of opposition to a motion for summary judgment, that is enough to create a triable issue of fact as to Dr. Krause's qualification to testify as an expert witness.
[6] That motion involved a supplemental declaration from Krause indicating that was "familiar with the training and licensing of chiropractors" because he had been involved in the "debate" between the California Medical Association and the California Chiropractic Association "regarding the dispute over what types of spinal conditions chiropractors were qualified to treat." Because the majority of this panel consider Krause's original declaration to be sufficient, we will not explore the question of to what degree the second declaration might have made any difference.
[7] However, this indulgence is prompted only because the merits of the appeal as to Miles must be decided anyway. The current trend in the intermediate appellate courts is to force litigants to go back to the end of the line if they file a (premature) notice of appeal. (E.g., Hill v. City of Long Beach (1995) 33 Cal.App.4th 1684, 1695-1696, 40 Cal.Rptr.2d 125.) Here, in effect, Miles held Kennedy's place in line for the benefit of the appellant.
[8] For example, a Michigan appellate court once held that a chiropractor had no duty to detect a patient's specific cardiac problems because chiropractors cannot, by law, do the sorts of tests that might have revealed cardiac problems qua cardiac problems. (See Estate of Braford (2000) 243 Mich.App. 524, 537, 624 N.W.2d 245.)
[9] Back in the 1930'sthat is, before the widespread availability of antibioticstraditional "allopathic" medicine vied with its chief rival, homeopathic medicine. Allopathic medicine is generally defined as direct and contrary intervention, while homeopathy is seen as indirect intervention (a bit like reverse psychology) where a little bit of some negative agent is given to a patient to induce a positive reaction.
[10] In Abos, the court structured its opinion by summarizing the testimony of each M.D. without going into their credentials in any detail. Thus: "Frank R. Webb, physician and surgeon, associated with the office of the county coroner" testified about what was found at the autopsy, including the lack of evidence of spinal injury, and gave his opinion that the boy was really suffering from a form of early meningitis. (Abos, supra, 31 Cal.App.2d at pp. 710-711, 88 P.2d 797.) Next came "Dr. Gustave F. Boehme, M.D., a diagnostician," an expert who testified on the basis of an x-ray that that the boy was suffering from meningetic irritation and manipulation or adjustment of his spine would only make things worse. (Id. at p. 712, 88 P.2d 797.) Granted, the next witness was a chiropractor, though he testified, among other things, that "`general diagnosis'" and the use of blood counts, urinalysis and sputum was indeed taught at the Los Angeles College of Chiropractic. (See ibid.) The next witness was "Dr. Vincent Askey, M.D.," who testified that in his opinion the patient had suffered from a secondary tuberculosis of the spinal column and that the child died from "`lack of proper medical attention.'" (Id. at pp. 712-713, 88 P.2d 797.) After the summary of the testimony of doctors Webb, Boehme, and Askey, the Abos court turned its attention to "Appellant's claim that the testimony of the physicians called by respondent should have been excluded because they were of the allophatic [sic] and not the chiropractic school." (Id. at p. 713, 88 P.2d 797.) The claim was "without merit," for which the court immediately quoted the "We might add" passage from Hutter we have already quoted ourselves, and then declared, quite flatly, that medical doctors could testify about a chiropractor's breach of his or her duty of care: "The evidence of allopathic physicians being competent, the same provided testimony of sufficient substantiality, if believed by the jury, to warrant the latter in finding, as by their verdict they did, that the defendant [a chiropractor] did not exercise that degree of skill and care commonly exercised by persons practicing the medical profession in the same locality." (Id. at p. 714, 3 P.2d 554, italics added.)
[11] Indeed, if the legislature has not seen fit to confine certificates of merit to experts "certified in the same discipline as the defendant" (see Ammon, supra, 205 Cal.App.3d at p. 794, 252 Cal.Rptr. 748), it seems anomalous that the common law should do so in the context of expert testimony offered in opposition to a summary judgment motion, particularly given our Supreme Court's declarations in the opposite direction in Brown and Mann.
[1] Actually, the defendant in Ellinwood was not a chiropractor, but rather a "drugless practitioner" who employed a chiropractor to perform, under his direction, some of the treatments at issue in the case. The malpractice action concerned the drugless practitioner's negligence, and the verdict was entered against the drugless practitioner, not the chiropractor he employed. Thus Ellinwood fits within the general category of cases dealing with "cross-over" testimony, rather than cases in which a medical doctor testified as to chiropractic negligence. Though there is another, more important reason Ellinwood fails to support the majority opinion's "rule" that a medical doctor is always qualified to opine on the negligence of a chiropractor (discussed in the body of this dissent, post), it is worth noting this additional flaw in the argument, given the certitude with which the majority relies on Ellinwood. Despite the imprecision of the label "chiropractor" as applied to the defendant in Ellinwood, I nevertheless adopt the term in my discussion of the case, for ease of reference.
[2] This latter testimony was actually the only medical testimony that came close to applying a standard of care to the defendant, as opposed to simply reporting clinical observations of the extent and cause of plaintiff's injuries. For this reason, one may rightly quibble with the characterization of the medical testimony in this case as expert opinion on the standard of care.
[3] Dr. Webb did express the opinion that had the boy's condition been "properly diagnosed" his chances of recovery would have been better. One might infer this was an opinion that the chiropractor was negligent for failing to make a proper diagnosis, but Dr. Webb did not say so. His opinion is more easily understood as an opinion of causation, i.e., that a correct diagnosis early in the five-month course of treatment would have changed the outcome. Even if this single snippet of Dr. Webb's testimony is understood as a comment on the chiropractic standard of care, the "common observation" exception was actually adopted by the Abos court as its rationale, thus providing no support for a conclusion that medical doctors are always qualified to opine on chiropractic negligence. And there is no question the sad facts in Abos justified application of the common observation exception.